**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **INTELLECT WIRELESS INC.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 6763** |
| **v.** | ) | |
| | ) | **Hon. Rebecca R. Pallmeyer** |
| **SHARP CORPORATION, SHARP** | ) | |
| **ELECTRONICS CORPORATION,** | ) | |
| **HEWLETT-PACKARD COMPANY,** | ) | |
| **PALM, INC., DELL INC., and GARMIN** | ) | |
| **INTERNATIONAL, INC.** | ) | |
| | ) | |
| **Defendants.** | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

Plaintiff Intellect Wireless ("Plaintiff" or "IW") holds U.S. Patent Numbers 7,266,186 (the "'186 Patent") and 7,310,416 (the "'416 patent"), which contain both apparatus and method claims for improving wireless communications systems. Specifically, the patents enable device users to receive messages that include features now familiar to cell phone users: they display the photograph and phone number of the sender. Defendants, who are manufacturers of wireless communications devices, seek summary judgment of noninfringement on Plaintiff's claims of direct infringement and induced infringement. On the issue of direct infringement, Defendants contend that they cannot directly infringe Plaintiff's patent because Defendants do not make, use, or supply the message center, which Defendants argue is a necessary structural component of the relevant claim. On the issue of induced infringement, Defendants argue that Plaintiff has failed to establish the existence of any direct infringer and cannot prove that Defendants knew that the induced acts constitute patent infringement. For the reasons below, Defendants' motions for summary judgment are granted in part and denied in part.

## BACKGROUND

The claims at issue in the '186 and '416 patent, both issued in 2007, describe a wireless portable communications device used to receive a picture and caller ID information over a telephonic communications network. ('186 patent, claim 1; '416 patent, claim 1.) The '186 patent also describes a method of relaying picture messages to the device whereby a "message originator" sends the message to a "message center coupled to a communications network," which then transmits the message to the device along with the caller ID of the message originator, automatically provided by the communications network. ('186 patent, claim 18.) On October 20, 2010, IW filed suit against Defendants Sharp Corp., Sharp Electronics Corp., Hewlett-Packard Co., Palm Inc., and Dell Inc. (collectively, the "Defendants"),[1] manufacturers of wireless portable communications devices, claiming infringement of the apparatus claims. These manufacturers produce devices capable of sending and receiving picture messages, a common feature in modern cellular telephones.

The parties agree that noninfringement can be determined by analyzing claim 1 of the '186 patent, which reads:

> 1. A wireless portable communication device for use by a message recipient for receiving a picture from a message originator having a telephone number, comprising:
> a receiver operably coupled to receive a message from a message center over a wireless connection the message including a non-facsimile picture supplied by the message originator and a caller ID automatically provided by a communications network that identifies the telephone number of the message originator, the message originator sending the caller ID with the picture to the message center;
> a display; and
> a controller operably coupled to display the picture and caller ID on the display.

---

[1]	Garmin International, Inc., was also named as a defendant, but Plaintiff voluntarily dismissed the claim with prejudice after reaching a settlement agreement with Garmin. (Proposed Stipulation Order of Dismissal, Feb. 21, 2011 [71].)

('186 patent, claim 1.) Patent '416 contains similar language, including the limitation on which Defendants' motion for summary judgment turns: a "receiver operably coupled to receive a message from a message center over a wireless connection." ('416 patent, claim 1.)[2] Plaintiff claims that Defendants directly infringed the patents by manufacturing and selling "wireless portable communication devices that receive and display caller ID information, non-facsimile picture, video messages and/or Multimedia Messaging Service." (Pl.'s First Am. Compl. for Patent Infringement (hereinafter "Compl.") ¶¶ 14, 16, 18, 20.) Plaintiff further claims that Defendants, having been put on notice of the patents-in-suit by Plaintiff's complaint, continued to induce consumers to infringe the patents by demonstrating the devices' capability to receive and display such messages and instructing consumers how to use the device in an infringing manner. (Compl. ¶¶ 15, 17, 19, 21.) Plaintiff presents no evidence other than the notice given by its complaint to support its assertion that Defendants have knowledge of the patents. As evidence of continued inducement, Plaintiff presents advertisements and user manuals that Defendants published and disseminated after the date of the complaint. (Exs. G, H, I to IW's Resp. to Sharp's Rule 56.1 Statement [117].) Those materials, Plaintiff asserts, promote use of the devices for picture messaging.

On May 27, 2011, the court heard arguments on Defendants' motions to dismiss for failure

---

[2] Claim 1 of the '416 patent provides, in relevant part:

1. A wireless portable communications device comprising:
. . .
a portable receiver operably coupled to receive a message from a message center over a wireless connection, the message including a non-facsimile picture supplied by the message originator and a caller ID automatically provided by a communications network that identifies the telephone number of the message originator, the message originator sending the caller ID with the picture to the message center, the portable receiver coupled to the CPU; . . . .

('416 patent, claim 1.)

to state a claim. In those motions, Defendants made substantially the same arguments they now make in support of their motions for summary judgment: that (1) Defendants do not directly infringe the patents because claim 1 requires a wireless connection with a message center, which the Defendants neither make, use, or supply; and (2) IW cannot prove its claim of indirect infringement because consumers cannot directly infringe the patent and Defendants lacked knowledge that the induced acts constitute patent infringement. This court denied the motions to dismiss without prejudice because it was "reluctant to render a dispositive ruling that rests on claim construction or invalidity issues at the Rule 12(b)(6) stage." (Minute Order [91], May 27, 2011.) The court granted Defendants leave to file motions for summary judgment of noninfringement that address issues of claim construction. (Tr. [92] at 72-75.) Those motions are now before the court.

## DISCUSSION

The court grants summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The evidence the parties submit, pursuant to this court's Local Rule 56.1, is assessed to determine whether "a reasonable jury could return a verdict for the non-movant." *BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1378 (Fed. Cir. 2007) (citation omitted). The court will construe all facts and draw reasonable inferences in the light most favorable to the nonmoving party. *Del. Valley Floral Grp., Inc. v. Shaw Rose Nets, LLC*, 597 F.3d 1374, 1379 (Fed. Cir. 2010).

Because Defendants seek summary judgment for noninfringement, the court must engage in a two-step infringement analysis: "(1) the court must first interpret the claim, and (2) it must then compare the properly construed claims to the allegedly infringing device." *SafeTCare Mfg., Inc. v. Tele-Made, Inc.*, 497 F.3d 1262, 1268 (Fed. Cir. 2007) (citing *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1454 (Fed. Cir. 1998) (en banc)). The first step, claim construction, is a question of law

for the court to determine. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). The second step, determination of infringement, is a question of fact. *Id.*

## I.    Claim Construction[3]

Because an invention is defined by the claims of the patent, claim construction—the process of giving meaning to the claim language—defines the scope of the invention. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311-12 (Fed. Cir. 2005) (en banc) (citing 35 U.S.C. § 112). As the Federal Circuit clarified in *Phillips*, claim construction begins with the words of the claims

---

[3]    In a related case brought by IW against different phone manufacturers and a wireless carrier (Sprint), the parties disputed whether "the phrase 'the message originator sending the caller ID with the picture to the message center' appearing in claim 1 of both the '186 and '416 Patents impermissibly recites a method for operating the claimed apparatus." *Intellect Wireless, Inc. v. Kyocera Commc'ns, Inc.*, No. 08 C 1350, 2009 WL 3259996, at *2 (N.D. Ill. Oct. 8, 2009). If that phrase did recite a method for operating the apparatus, defendants argued, those claims and the dependent claims would be "invalid for indefiniteness under *IPXL Holdings, L.L.C. v. Amazon.com, Inc.*, 430 F.3d 1377 (Fed. Cir. 2005)." *Id.* Under *IPXL Holdings*, "reciting both an apparatus and a method using that apparatus renders a claim indefinite under [35 U.S.C. § 112]." 430 F.3d at 1384. *But cf. Microprocessor Enhancement Corp. v. Tex. Instruments, Inc.*, 520 F.3d 1367, 1375 (Fed. Cir. 2008) ("[A]pparatus claims are not necessarily indefinite for using functional language."); *see also HTC Corp. v. IPCom GmbH & Co., KG*, 667 F.3d 1270,1277 (Fed. Cir. 2012) (finding definite claims that "merely establish [enumerated functions] as the underlying network environment in which the [apparatus] operates"). Applying this standard to the disputed language, Chief Judge Holderman concluded in *Kyocera* that "[t]he plain language of the claims indicates that direct infringement is limited to a communication device possessing the recited structure and capable of receiving a message from the message originator via the message center; infringement does not require that 'the message originator [send] the caller ID with the picture to the message center.'" *Intellect Wireless*, 2009 WL 3259996, at *5. Under this reading of claim 1, Judge Holderman concluded that the claim was definite and therefore the case could proceed against both the wireless provider and the phone manufacturers.

Both Plaintiff and Defendants cite language used by Judge Holderman in support of their claim construction. Defendants argue that Judge Holderman interpreted the claim to require an actual connection when he stated, "Claim 1 of the '416 Patent also claims an independent apparatus directed to a wireless portable communication device *coupled to a 'message center'* to receive a message from a 'message originator.'" *Id.* at *2 (emphasis added). But Plaintiff notes that Judge Holderman characterized the message center as a "separate, unclaimed system" and read claim 1 to require that the device merely be "*capable* of receiving a message from the message originator via the message center." *Id.* at *2, 5 (emphasis added). In any event, "the opinion of one district court is entitled only to comity in another district court." *Mendenhall v. Cedarapids, Inc.*, 5 F.3d 1557, 1570 (Fed. Cir. 1993). The language used by Judge Holderman to characterize the claim is not relevant to the resolution of this case because his focus was on a different part of claim 1 than at issue here, and he resolved the indefiniteness issue without resorting to claim construction.

themselves, giving those words their ordinary and customary meaning; that is, the "meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention." *Id.* at 1312-13. That person is assumed to read the claim terms "in the context of the entire patent, including the specification." *Id.* at 1313. The specification cannot, however, "be used to narrow a claim term—to deviate from the plain and ordinary meaning—unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 659 F.3d 1369, 1371 (Fed. Cir. 2011) (citing *Phillips*, 415 F.3d at 1316).

In addition to reading the claim terms in the context of the specification, the court may also consider the record of the patent's prosecution as evidence of how both the inventor and the Patent Office understood the patent. *Phillips*, 415 F.3d at 1317. The court must, however, be mindful that prosecution history represents an "ongoing negotiation," so it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Id.* Finally, in some cases, the court must go beyond the claim language, the specification, and the prosecution history—the so-called intrinsic evidence—to consider extrinsic evidence such as technical dictionaries, treatises, and expert testimony. *Id.* at 1317-18. Extrinsic evidence is deemed less reliable than the intrinsic evidence for several reasons outlined by the Federal Circuit in *Phillips*. *Id.* at 1318-19. Courts may, however, "rely on dictionary definitions when construing claim terms, so long as the dictionary does not contradict any definition found in or ascertained by a reading of the patent documents." *Id.* at 1322-23 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1584 n.6 (Fed. Cir. 1996)).

## A.  Language of the Claims

With these standards of construction in mind, the court turns to the disputed language in claim 1 of the '186 patent: "a receiver operably coupled to receive a message from a message

6

center over a wireless connection." The parties disagree about whether the term "operably coupled" means that the receiver must be wirelessly connected to the message center, as Defendant contends. According to IW's interpretation, the receiver need only be capable of receiving the message from the message center; the receiver need not be connected with anything external to the device.

The term "operably coupled" appears in several of the patent's claims. For example, claim 7 includes "an input operably coupled to the controller" ('186 patent, claim 7), and claim 4 addresses "the controller being operably coupled to store the received message in the memory." (*Id.* claim 4). Within claim 1 itself, "operably coupled" also appears in the claim's description of the controller component: "a controller operably coupled to display the picture and caller ID on the display." (*Id.* claim 1.) In addition, the term "coupled" appears in claim 18 without the adverb: "a message center coupled to a communications network." (*Id.* claim 18.) Similarly, "coupled" appears in claim 1 of the '416 patent, which includes the contested claim language from claim 1 of the '186 patent followed by the phrase, "the portable receiver coupled to the CPU." ('416 patent, claim 1.) Finally, claim 12 of the '186 patent, among others, employs the term "operable to": "wherein at least a portion of the received message is compressed, and wherein the controller is operable to decompress the compressed portion of the message." ('186 patent claim 12.)

IW contends that the patentee used the term "operably coupled" in two distinct ways: "1) to claim a component that is 'operably coupled' to perform a function, e.g., 'a receiver *operably coupled to receive* a message'; or 2) to claim a component that is 'operably coupled' to another component, e.g., 'an input *operably coupled to the controller*.'" (IW's Opp. to Sharp Corp.'s and Sharp Electronics Corp.'s Mot. and Mem. for Summ. J. of Noninfringment (hereinafter "Pl.'s Opp. to Sharp"), at 4.) Thus, IW appears to concede that in the context of claims such as claim 7—"an input operably coupled to a controller"—the term "operably coupled" implies a connection. In contrast, according to IW's reading of the language in claim 1, the receiver need not be connected

7

to the message center, or any other claim component for that matter; it need only be capable of receiving a message.

The patentee knew, however, how to articulate a claim component's functional capability without using the term "coupled," as he did when using the term "operable to" in claim 12 discussed above. By reading claim 1 in the same way, Plaintiff appears to ignore the term "coupled" and the connection it implies. As Defendants point out, the patentee could have used the term "couplable" to incorporate the receiver's capability to form a wireless connection with the message center without requiring an actual wireless connection.

A court can, of course, find that a patentee defined a term implicitly. Case law on that issue reveals, however, that implicit definitions arise from a "term's *consistent* use throughout the . . . specification." *Bell Atl. Network Servs. Inc. v. Covad Commc'ns Grp., Inc.*, 262 F.3d 1258, 1273 (Fed. Cir. 2001) (emphasis added). Here, Plaintiff would have this court read the same language in two different ways, but this runs afoul of the "'presumption that the same terms appearing in different portions of the claims should be given the same meaning unless it is clear from the specification and prosecution history that the terms have different meanings at different portions of the claim.'" *PODS, Inc. v. Porta Stor, Inc.*, 484 F.3d 1359, 1366 (Fed. Cir. 2007) (quoting *Fin Control Sys. Pty., Ltd. v. OAM, Inc.*, 265 F.3d 1311, 1318 (Fed. Cir. 2001)). Applying the presumption to this case, a person skilled in the art would read the disputed language to mean that the receiver is wirelessly connected, either directly or indirectly, with a message center for the transfer of picture messages and caller ID information.

Use of the term in this way appears consistent with the dictionary definition of "coupled," which implies a connection. *See Webster's Third New International Dictionary* 522 (2002) (defining "coupled" as "mechanically or electronically connected"). This reading is consistent with the way other courts have construed the term "coupled," as well. *See e.g.*, *MEMS Tech. Berhad v. Int'l Trade Comm'n*, 447 F. App'x 142, 151-52 (Fed. Cir. 2011)(finding "electrically coupled" to mean

8

"arranged so that electrical signals may be passed either directly, or indirectly via intervening circuitry, from one component to another"); *WeddingChannel.com, Inc. v. The Knot, Inc.*, No. 03 Civ.7369(RWS), 2005 WL 165286, at *10-12 (S.D.N.Y.Jan. 26, 2005) (construing "coupled" to mean "connected, directly or indirectly, to allow the transfer of signals or information").

As for the term "operably," Defendants point out that the Federal Circuit has interpreted the similar adverb "operatively" as a term "often used descriptively in patent drafting to mean 'effectively' in describing the functional relationship between claimed components." *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1306 (Fed. Cir. 2005); *see also Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1118 (Fed. Cir. 2004) ("'[Operatively connected] is a general descriptive term frequently used in patent drafting to reflect a functional relationship between claimed components."). In these cases, the court was able to determine the function that the coupled claim components must be able to perform from reading the claim and the rest of the specification. *See Cross Med.*, 424 F.3d at 1306 (construing "lower bone interface operatively joined to said bone segment" to mean "the interface and the bone segment are connected and in contact such that the device is effective to perform posterior stabilization."); *Innova/Pure Water*, 381 F.3d at 118 (construing "said tube operatively connected to said cap" to mean "the tube and cap are arranged in a manner capable of performing the function of filtering").

The words "operatively" and "operably" do not have precisely the same meaning. In adjective form, the dictionary definition of "operative" is "producing an appropriate or designed effect" or "having the power of acting"; the word "operable" is defined as "fit, possible, or desirable to use." *Webster's Third New International Dictionary* 1580-81. This distinction does not appear, however, to have a significant impact on how the two adverbs are interpreted, at least in the two cases Plaintiff cites. In *KCJ Corp. v. Kinetic Concepts, Inc.*, the court interpreted the term "operably coupled" in a patent for an air flotation, ventilated mattress to mean "two elements work

in concert to create an inflatable chamber, e.g. one which is not air tight but can receive and hold air." 30 F. Supp. 2d 1319, 1327 (D. Kan. 1998). In *Lawler Manufacturing Co. v. Bradley Corp.*, the court interpreted the term "operably connected to" in a patent for a thermostatic mixing valve for use in an emergency shower and eyewash system. No. IP98-1660-C-M/S, 2000 WL 33281119, at *21-24 (S.D. Ind. Nov. 30, 2000). In addressing the portion of the patent's claim for the "second thermostat portion being operably connected to said flow control valve means," the court read "operably connected" to mean "capable of performing work on or capable of effecting the movement of." *Id.* at *22; *see also Callpod, Inc. v. GN Netcom, Inc.*, No. 06 C 4961, 2009 WL 590156, at *3-4 (N.D. Ill. Mar. 6, 2009) (construing "operably connecting" to mean "connected in a manner that allows a signal to flow from one point to another point"). In all of these cases, "operably" is interpreted to describe the function which a component must be able to perform in conjunction with another, specified component.

In this case, claim 1's preamble specifies that the invention's purpose is "for use by a message recipient for receiving a picture from a message originator having a telephone number." The body of the claim specifies that the coupling between the receiver and message center is via a wireless connection for the purpose of receiving such messages. Thus, a receiver falls within the scope of claim 1 where it is wirelessly connected with a message center in a manner capable of allowing the picture message and caller ID information to be transferred to the receiver.

Plaintiff cites the preamble to claim 1 for the proposition that the patentee was claiming a "wireless portable communication device," not an entire interconnected wireless communication system, which is the subject matter of method claims 18 through 37. Where, however,

> the body of the claim fully and intrinsically sets forth the complete invention, including all of its limitations, and the preamble offers no distinct definition of any of the claimed invention's limitations, but rather merely states, for example, the purpose or intended use of the invention, then the preamble is of no significance to claim construction because it cannot be said to constitute or explain a claim limitation.

10

*Pitney Bowes, Inc. v. Hewlett-Packard Co.*, 182 F.3d 1298, 1305 (Fed. Cir. 1999). Accordingly, the label "wireless portable communications device" in the preamble cannot be read to eliminate the limitation set forth in claim 1 that requires an actual wireless coupling between the receiver and the message center.

## B.   Specification

Plaintiff contends that if "physically coupled to anything," the specification reveals that the receiver is coupled with the antenna. (Pl.'s Opp. to Sharp at 7.) Plaintiff points to Figure 1B and the corresponding written description, which explains that "[t]he antenna 1024 is coupled to receiver 1012," ('186 Patent at 27.) so that "the receiver 1012 is capable of receiving messages in any of several message formats through antenna 1024." (*Id.* at 29.) It is this connection, Plaintiff claims, that allows the receiver to fulfill the device's purpose of receiving a picture message. According to this theory, the court should read "operably coupled" in claim 1 to refer to the physical coupling between the antenna and the receiver.

But Claim 1 makes no mention of the antenna, and as explained above, the specification cannot be used to deviate from the plain and ordinary meaning of the claim. *See Retractable Techs.*, 659 F.3d at 1371; *see also SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) (plurality opinion) ("If everything in the specification were required to be read into the claims . . . there would be no need for claims. . . . It is the *claims* that measure the invention."). Indeed, Plaintiff acknowledges that the patent figure it relies on shows the receiver connected to a number of different components within the device. ('186 Patent, fig.1B.) Claim 1 explicitly mentions the message center, and other drawings in the specification reveal a connection, either direct or indirect, between the claimed device and the message center. (*See, e.g.,* '186 Patent, figs.2A, 13). The specification's reference to connections between the receiver and other components does not alter the court's conclusion that a person skilled in the art would interpret

claim 1 to be addressing the wireless connection between the receiver and the message center.

Neither does the word "coupled" imply that the connection needs to be physical and direct, as Plaintiff appears to contend. To the contrary, figure 2A shows that the message center may transmit the message to the receiver indirectly, through a paging center. (*See also* '186 Patent, at 33 ("The message center could . . . store conventional fax header information received for retransmission to a paging center or for transmission to a personal communicator directly from a paging transmitter integral or directly connect to the message center."). ) Similarly, the message center and receiver are indirectly connected even though the data sent by the message center passes first through the intervening circuitry of the antenna.

## C.    Prosecution History

The prosecution history of the patents-in-suit confirms that the wireless connection between the receiver and the message center is a limitation in claim 1. The Federal Circuit has observed that "[i]nclusion of a limitation in a claim to avoid the prior art provides strong evidence of the materiality of the included limitation." *In re Berger*, 279 F.3d 975, 982 (Fed. Cir. 2002). The relevant portion of claim 1 of the '186 patent (claim 33 during prosecution) originally read:

> a receiver operably coupled to receive, over a wireless communication connection, call data including a message and a unique identifier associated with the wireless portable communication device, the message including visual image data, the call data optionally including associated caller identification information . . . .

(Selected Pages from the '186 Patent, Ex. D to Sharp's 56.1, at D31.) As written, the Patent Office rejected the claim as anticipated by U.S. Patent Number 5,117,449, (*Id.* at D42-43.),[4] in response to which the patentee amended the claim as follows:

---

[4]     The prior art patent claimed, in relevant part, "[a]n integrated paging and radio telephone apparatus with integral keypad for entering data, comprising: a) first receiving means for receiving radiotelephone signals; b) second receiving means for receiving paging signals . . . ." U.S. Patent No. 5,117,449, claim 1.

> a receiver operably coupled to receive <u>a message from a message center</u> over a wireless ~~communication~~ connection, ~~call data~~ <u>the message</u> including a ~~message and a unique identifier associated with the wireless portable communication device~~ <u>picture supplied by the message originator and a caller ID automatically provided by a communications network that identifies the telephone number of the message originator</u>, ~~the message including visual image data, the call data optionally including associated caller identification information~~ <u>the message originator sending the caller ID with the picture to the message center</u> . . . .

(*Id.* at D54.) Thus, the addition of the words "a message from a message center" appears to have been necessary to avoid prior art.

Moreover, the prosecution history reveals that the reference to the message center was more than just window dressing. In the prosecution history for Patent No. 7,251,318, part of the patent family from which the patents-in-suit belong, the Patent Office mapped the language at issue to structures within the prior art, including "receiver," "message center," and "wireless connection." (Attach. A to Sharp's Reply Mem. of Law in Supp. of Sharp's Mot. for Summ. J. of Noninfringement, at A97.) The prosecution history thus supports Defendants' argument that a wireless connection with the message center is a necessary element of the claimed component, not just an environment in which the claim component operates.

## II. Direct Infringement

Summary judgment on the issue of direct infringement is proper "when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." *Innovention Toys, LLC v. MGA Entm't, Inc.*, 637 F.3d 1314, 1319 (Fed. Cir. 2011). According to the doctrine of divided infringement, "infringement requires . . . a showing that a defendant has practiced each and every element of the claimed invention." *BMC Res.*, 498 F.3d at 1380. Plaintiff has not argued that the "mastermind" exception to this rule applies in this case. *See Id.* at 1381 ("A party cannot avoid infringement . . . simply by contracting out steps of a

patented process to another entity.")[5] Applying this rule to an apparatus claim, the Federal Circuit held that a medical device manufacturer did not directly infringe a patent for an orthopedic surgical implant where the relevant limitation claimed a "lower bone interface *operatively joined* to [one or more bone segments of the spine]." *Cross Med.*, 424 F.3d at 1299. The court construed the claim language to apply "when the interface and the bone segment are connected and in contact such that the device is effective to perform posterior stabilization." *Id.* at 1306. Because the only way of connecting the interface with the bone segment was through surgery, the court held that the defendant medical device manufacturer, which did not perform surgeries, could not be a direct infringer. *Id.* at 1312.

Just as the surgeon, but not the device manufacturer, could be a direct infringer in *Cross Medical*, here the wireless telephone providers, like T-Mobile and AT&T, could be direct infringers because they supply the consumer with the devices, the message center, and the rest of the wireless communications network. But Defendants, who only supply devices capable of being coupled to a message center, cannot be direct infringers because they do not supply, control, or use the message center. *Cf. Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1284 (Fed. Cir. 2011) ("[T]o 'use' a system for purposes of infringement, a party must put the invention into service, *i.e.,* control the system as a whole and obtain benefit from it. . . . In order to 'put the system into service,' the end user must be using all portions of the claimed invention."). IW has not produced evidence to suggest that the devices Defendants manufacture are wirelessly connected to a message center and capable of receiving picture messages when sold to wireless communications providers for resale to consumers.

---

[5] Nor does the Plaintiff claim the Defendant committed joint or contributory infringement with communications network providers, like T-Mobile and AT&T. The court understands that the Plaintiff has already sued, and settled its case with, the communication network providers.

The case IW relies on to support its claim for direct infringement, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292 (Fed. Cir. 2011), is distinguishable.  In *Uniloc*, the patentee claimed that Microsoft directly infringed a patent for a software registration system.  The patent claimed "[a] remote registration station incorporating remote licensee unique ID generating means, said station forming part of a registration system . . . including local licensee unique ID generation means . . . ." *Id.* at 1309 (alterations in original).  Microsoft argued that it did not directly infringe because it "did not supply or use the end-users' computers that implemented the local licensee unique ID generating means." *Id.* at 1308.  The Federal Circuit rejected that argument.  The court concluded that the claim "focuses exclusively on the 'remote registration station,' and defines the environment in which that registration station must function. . . . That other parties are necessary to complete the environment in which the claimed element functions does not necessarily divide the infringement between the necessary parties." *Id.* at 1309.  The court also distinguished *Cross Medical*, noting that the *Cross Medical* court's conclusion that the medical device manufacturer did not "'itself make an apparatus with the "interface" portion in contact with bone'" turned on its construction of the "operatively joined" language. *Id.* (quoting *Cross Med.*, 424 F.3d at 1311).  In contrast, Microsoft made and used the remote registration stations in the environment required by the claim.

But here, the wireless connection between the device and the message center is more than just a description of the environment in which the device must operate.  The claim language is not "a receiver forming part of system including a wireless connection to a message center," it is "a receiver operably coupled to receive a message from a message center over a wireless connection"—language much closer to the "operatively joined" language in *Cross Medical*.  Unlike Microsoft in *Uniloc*, who made and used the remote registration station, Defendants here do not make or use the message center.

Because Defendants do not make, use, or supply the wireless connection with the message center required by claim 1, the court grants Defendants' motions for summary judgment on the claims for direct infringement.

## III.    Induced Infringement

Plaintiff also claims that Defendants induced consumers to directly infringe the patent through marketing material and user manuals that feature use of the device for picture messaging. Pursuant to 35 U.S.C. § 271(b), "[w]hoever actively induces infringement of a patent shall be liable as an infringer."  Liability for indirect infringement "requires, as a predicate, a finding that some party amongst the accused actors has committed the entire act of direct infringement." *BMC Res.*, 498 F.3d at 1379 (citing *Dynacore Holdings Corp. v. U.S. Philips Corp.*, 363 F.3d 1263, 1272 (Fed Cir. 2004)).  Additionally, the Supreme Court recently established that to prove a claim of induced infringement under § 271(b), plaintiff must show that the defendant knew "that the induced acts constitute patent infringement," although the Court recognized that "willful blindness" to the patent may satisfy this knowledge requirement.  *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068-69 (2011).  Where a plaintiff can establish that a defendant knew certain uses constituted patent infringement, "[e]vidence of 'active steps . . . taken to encourage direct infringement,' such as advertising an infringing use or instructing how to engage in an infringing use, shows an affirmative intent that the product be used to infringe."  *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913, 936 (2005) (alteration in original) (citation omitted) (quoting *Oak Indus., Inc. v. Zenith Elecs. Corp.*, 697 F. Supp. 988, 992 (N.D. Ill. 1988)).

On the issue of the direct infringer prerequisite, IW contends that consumers are the direct offenders whom the Defendants induce to violate the patent.  Defendants claim that the consumers cannot be direct infringers because consumers "cannot on their own connect phones to message centers," a process that requires hardware and authorization from a communications network

provider. (Defs. Dell, Hewlett-Packard, and Palm's Mem. of Law in Supp. of Their Mot. for Summ. J. of Non-infringement (hereinafter "Dell's Mem."), at 19.) As this court construed the claim, however, a mobile communication device falls within the relevant limitation in claim 1 where the receiver is wirelessly connected to a message center in a manner capable of allowing the picture message and caller ID information to be transferred to the receiver. The consumer need not necessarily own or operate the message center to establish this wireless connection. For example, the Federal Circuit, addressing a systems claim, observed that while a consumer must "control the system as a whole and obtain benefit from it" to be a direct infringer, "[t]he 'control' contemplated . . . is the ability to place the system as a whole into service." *Centillion*, 631 F.3d at 1284. Here, the hardware and authorization necessary to establish the wireless connection is something presumably covered by the contract between the consumer and the communications network provider. Thus, the consumer's use of the device falls within the relevant limitation of claim 1 when the consumer operates a device wirelessly connected to a message center and capable of receiving a picture message and caller ID.

The parties also dispute whether knowledge as of the time of the complaint is sufficient to establish knowledge of the patent. The parties appear to agree that Defendants first became aware of the patents-in-suit when IW filed its complaint. Defendants cite to several district court decisions that conclude, without analysis, that knowledge as of the time that the lawsuit is filed is insufficient to satisfy the knowledge requirement for induced infringement. *See Aguirre v. Powerchute Sports, LLC*, No. SA-10-CV-0702 XR, 2011 WL 2471299, at *3 (W.D. Tex. June 17, 2011); *Xpoint Techs., Inc. v. Microsoft Corp.*, 730 F. Supp. 2d 349, 357 (D. Del. 2010); *Mallinckrodt, Inc. v. E-Z-Em Inc.*, 670 F. Supp. 2d 349, 354 n.1 (D. Del. 2009). Plaintiff, for its part, also cites district court decisions—cases that support IW's contention that knowledge as of the time of the complaint is sufficient where a plaintiff can prove that the defendants continued to induce infringement. *See Tech. Patents LLC v. Deutsche Telekom AG*, No. AW-07-3012, 2010 WL

17

3895338, at *2 (D. Md. Sept. 29, 2010); *Wing Shing Prods. (BVI), Ltd. v. Simatelex Manufactory Co.*, 479 F. Supp. 2d 388, 408 (S.D.N.Y. 2007).

Recent decisions in cases before this court support IW's position. *See Trading Techs. Int'l, Inc. v. BCG Partners, Inc.*, No. 10 C 714 etc., 2011 WL 3946581, at *4 (N.D. Ill. Sept. 2, 2011); *Groupon Inc. v. MobGob LLC*, No. 10 C 7456, 2011 WL 2111986, at *3 (N.D. Ill. May 25, 2011). For example, in *Trading Technologies*, which postdates the Supreme Court's *Global-Tech* decision, the district court noted the conflicting caselaw on the subject, citing *Mallinckrodt* and *Groupon*. *Id.* The court concluded that

> the *Groupon* approach is the more practical one, assuming the plaintiff can plead
> that the defendant continues to sell its infringing product. The Court sees no reason
> why a defendant who is directly infringing on a product should avoid liability for an
> indirect infringement claim when it continues to sell the allegedly infringing product
> and encourages others to infringe, simply because it happened to learn of the
> patent in connection with a lawsuit.

*Id.* This court is convinced by the reasoning in *Groupon* and *Trading Technologies* and believes it applies equally to defendants who are not direct offenders, but nevertheless continue to promote infringing uses of their products after learning about the patents. Therefore, Defendants' knowledge of the patent as of the time of the suit's commencement can satisfy the knowledge requirement for conduct that post-dates the date of the complaint.[6]

Finally, Defendants contend that they lacked knowledge that the induced acts constitute patent infringement, which they argue is evidenced by their defense in this litigation. Defendants cite *Kinetic Concepts, Inc. v. Blue Sky Med. Grp., Inc.*, 554 F.3d 1010 (Fed. Cir. 2009), for the proposition that the Defendants' subjective belief of non-infringement is sufficient to overcome a

---

[6] Sharp argues that under this rule, "every plaintiff could establish the [knowledge] requirement simply by filing an amended complaint." (Sharp Mem. at 14.) The court agrees with Sharp that filing an amended complaint should not enable a plaintiff to recover damages for pre-filing inducement. If a plaintiff sought liability and damages for pre-filing inducement, knowledge of the patent resulting from the complaint would not be sufficient to establish the knowledge required to impose liability for acts of inducement that occurred before the commencement of the lawsuit.

claim of indirect infringement. What Defendants believed, however, is a question of fact for the jury to determine. Indeed, *Kinetic Concepts* concerned whether the district court correctly denied a plaintiff's JMOL motion challenging a jury verdict in favor of the defendants. *Id.* at 1024-25. There, the Federal Circuit observed that the jury found the intent required for induced infringement lacking after having the opportunity to assess the credibility of witnesses for the defendant. *Id.* at 1025. Here, Defendants' evidence of a subjective belief of noninfringement, which at this point consists only of arguments made by Defendants' counsel,[7] is not so overwhelming that no reasonable jury could find that Defendants, having been made aware of the patents-in-suit, continued to supply the mobile devices and encourage picture messaging with knowledge that such use infringed the patents.[8]

---

[7] Notably, Defendants' attorneys have not offered affidavits from their own clients concerning the client's subjective beliefs. Rather, Defendants' attorneys argue that Defendants' subject belief of noninfringement is manifest by the motions filed in this action. (Dell's Mem. at 18; Mem. of Law in Supp. of Sharp Corp.'s and Sharp Electronics Corp.'s Mot. for Summ. J. of Noninfringement (hereinafter "Sharp Mem."), at 14-15.)

[8] Defendant Sharp argues, additionally, that IW's factual allegations concerning user manuals for its handsets are false. Specifically, Sharp disputes IW's assertions that "Sharp produced user guides for the Kin One, the Kin Two, and the FX handsets, which show end users how to send, receive, and display picture messages and caller ID," and that "Sharp has continued to advertise and promote the ability of its handsets, including the FX, to send, receive, and display picture messages." (IW's Rule 56.1(b)(3)(C) Statement of Additional Facts ¶ 30-31.) Sharp contends that the user manuals IW references for the Kin line of handsets bear a Microsoft copyright, and the manual for the FX displays the AT&T logo. The court notes, however, that at least some of the evidence IW provides to support its factual assertions bear a Sharp copyright, including Sharp's website advertising the FX. Furthermore, the FX user manual bears both the Sharp and AT&T trademarks, which raises a genuine dispute as to whether Sharp was responsible for its authorship.

Sharp's observation that these manuals are either undated or predate the filing of the complaint are not necessarily dispositive for IW's claim. IW may still prove induced infringement if it can demonstrate that Sharp continued to distribute user manuals or other literature after learning that some of the uses featured in that material were infringing. *See Tech. Patents*, 2010 WL 3895338, at *5 ("Although Samsung argues that it drafted the instructions before it had knowledge of the Patent . . . the fact that it declined to change the instructions after learning of the Patent at least creates a genuine dispute regarding Samsung's intent to induce infringement."). Therefore, summary judgment on this issue is improper.

## CONCLUSION

For the foregoing reasons, Defendants' motions for summary judgment [101, 104] are granted in part and denied in part. Defendants' motions are granted with respect to the claims for direct infringement (Compl. ¶¶ 14, 16, 18, 20), and denied with respect to the claims for induced infringement (Compl. ¶¶ 15, 17, 19, 21).

ENTER:

Dated: March 9, 2012

_____
REBECCA R. PALLMEYER
United States District Judge