**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| INTELLECT WIRELESS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | The Hon. Rebecca R. Pallmeyer |
| | ) | |
| v. | ) | |
| | ) | Civil Action No. 10 C 6763 |
| SHARP CORPORATION, SHARP ELECTRONICS CORPORATION, HEWLETT-PACKARD COMPANY, PALM, INC., DELL INC., AND GARMIN INTERNATIONAL, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS HEWLETT-PACKARD COMPANY AND PALM, INC.'S REPLY IN SUPPORT OF AN ATTORNEYS' FEES AWARD AGAINST THE ATTORNEYS FOR INTELLECT WIRELESS**

TABLE OF CONTENTS

Page

I. Introduction and Background ... 1

II. Niro Repeatedly Filed Pleadings in This Lawsuit It Knew Were False ... 3

A. IW's Complaint and Amended Complaint Include Statements Niro Knew To Be False ... 3

B. IW's Answer to HP's Counterclaims Include Statements Niro Knew To Be False ... 4

III. Argument ... 6

A. HP's Motion is Timely ... 6

B. The Court Should Sanction Niro Under Rule 11 ... 9

1. Niro Admits It Did Not Investigate the False Declarations Prior to Suit ... 9

2. Niro Cannot Claim Reliance on Henderson for False and Misleading Statements ... 11

3. The Niro Firm Should Be Liable for Its Actions in This Suit ... 12

C. The Court Should Impose Sanctions Under Section 1927 or the Court's Inherent Authority ... 12

D. Niro Attempts to Distract The Court With Irrelevant Information ... 13

IV. Conclusion ... 14

## I. Introduction and Background

Raymond Niro, Paul Vickrey, Paul Gibbons, David Mahalek, Joseph Culig, and Niro, Haller & Niro Ltd. (the "Niro firm" and, collectively, "Niro") pursued this litigation even though they knew that Daniel Henderson committed fraud on the United States Patent and Trademark Office ("PTO") by submitting false declarations to obtain allowance of the patents-in-suit. The facts underlying this motion are very straightforward. As Henderson stated at the time he filed his false declarations, "even marginally-competent litigation counsel" would recognize the "lethal blow to the integrity and validity of [Henderson's] patent portfolio." (Ex. 1.) Niro, seasoned patent litigation counsel, had no reasonable excuse for filing and pursuing this litigation. Niro knew that Henderson had never built a device that could receive or display caller ID and a picture, *i.e.*, a critical limitation required by each and every claim in Henderson's patent portfolio. (*See, e.g.*, Exs. 29-32.) Niro also knew that Henderson had submitted contrary sworn statements to the PTO that he built a device that could receive caller ID and a picture over a wireless network. (Exs. 9, 34.) Thus, prior to filing this lawsuit, Niro knew all the facts necessary to conclude that Henderson's declarations to the PTO were false.

More specifically, Niro was working with Henderson at the time his false declarations were filed with the PTO in 2007. There are billing records, phone records, memoranda, and other correspondence demonstrating the active working relationship between Niro and Henderson in January and February 2007. (Exs. 1, 3-8.) On February 10, 2007, the day after Henderson's first false declaration, Henderson and his patent prosecution attorney, Robert Tendler, both agreed that they should consult Niro regarding the false declaration. (Ex. 1.) There is no documentary evidence to the contrary. Then, on November 6, 2009, Henderson told Niro his "***device did not actually receive caller id*** automatically from the telephone network" and that it "did not operate." (Ex. 2.) This email information was recirculated between Niro and

Henderson on February 10, 2010 when Niro and Henderson were preparing IW's First Supplemental Response to HTC's interrogatories. (Ex. 10.) Niro withheld the November 6 and February 10 e-mails, which Niro previously thought would never see the light of day, from Defendants until June 2014 when Judge Hart ruled that there was no attorney-client privilege under the crime-fraud exception. *Intellect Wireless, Inc. v. HTC Corp.*, No. 1:09-cv-2945, Dkt. 291 (N.D. Ill. May 6, 2014). Now that Niro could no longer conceal these e-mails, Niro was forced to concede that by February 2010 it "learned that Henderson's prototypes were not sufficiently operable to prove workability of his invention." (Dkt. 184 at 10.) The November 6 e-mail informed Niro that a critical element of every single claim in Henderson's patent portfolio was not present in his prototype, and therefore, there was no actual reduction to practice. That alone was sufficient for any reasonable attorney to conclude that this lawsuit should never have been filed.

Subsequently, on September 23, 2010, one month prior to filing this lawsuit, HTC provided Niro a detailed written description of the specific inequitable conduct allegations, which eventually led this Court to dismiss this case. (Ex. 34.) Yet, Niro steadfastly maintains that it ***did not*** even discuss the false declarations with its client, Henderson, or the prosecuting attorney, Robert Tendler, prior to filing this frivolous and exceptional case. (Dkt. 235 at 10-11 ("The statement that the Niro firm had no discussions with Messrs. Henderson or Tendler about that Declaration before filing suit is true.").) This failure alone is a clear violation of Rule 11 and an utter failure to conduct a reasonable investigation prior to filing this lawsuit. Under no circumstances was it reasonable for Niro to bury its head in the sand and continue on its campaign to extract royalties (and collect its large contingency share of those royalties) from the wireless industry by asserting fraudulently obtained patents.

Instead, Niro filed this litigation and attempted to defeat Judge Hart's inequitable conduct ruling based on the false declarations by arguing that the declarations were not, in fact, false. Niro's untenable position was addressed by the Federal Circuit that explicitly held that there was "no dispute" that the declarations were false and that Niro's position was "entirely without merit." *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1342-44 (Fed. Cir. 2013). Although Niro has now been forced to concede that it "unequivocally" knew in February 2010 that "Henderson did ***not*** have actual reduction to practice" (Dkt. 184 at 10), this knowledge directly conflicts with the pleadings that Niro signed in this case.

## II. Niro Repeatedly Filed Pleadings in This Lawsuit It Knew Were False

### A. IW's Complaint and Amended Complaint Include Statements Niro Knew To Be False

There is no room for Niro to argue that its Complaint and Amended Complaint are not false and misleading. This Court has already determined that Niro's Complaint and Amended Complaint are false and misleading. (Dkt. 168 at 1-2, 18-19.) Specifically, the Court held that the Complaint and Amended Complaint "misleadingly allege that the Smithsonian received 'Henderson's *prototype* for a wireless *picturephone* device.'" (*Id.* (quoting Dkt. 1 at 1-2).) The Court went on to describe Niro's use of the PC Today article as deceptive as well, "[a]ttempting to reinforce that claim in the complaint and amended complaint in this case, Plaintiff included a quotation from an article in *PC Today*, published in June 2009, which states that 'Daniel A. Henderson put together a couple of *prototypes*' for a '*camera phone*' in 1993." (*Id.*) The Court described these statements in both the Complaint and Amended Complaint as "at a minimum misleading, and can fairly be read to imply that Henderson had created a working prototype of the patented invention as early as 1993" as part of a "pattern of deceit." (*Id.* at 18-19.) There can be no argument that these documents are not false and misleading, especially when Niro

admits in February 2010, prior to filing this lawsuit, it "learned that Henderson's prototypes were not sufficiently operable to prove workability of his invention." (Dkt. 184 at 10.) Niro knew there was no picturephone, yet filed this litigation in its ongoing scheme to extract settlements and collect its contingency share.

### B. IW's Answer to HP's Counterclaims Include Statements Niro Knew To Be False

Niro filed its Answer to HP's counterclaims believing that Henderson's November 6, 2009 email would never see the light of day. Indeed, it was only produced to Defendants in June 2014, after Judge Hart ruled that the crime-fraud exception to the attorney-client privilege applied. *Intellect*, No. 1:09-cv-2945, Dkt. 291. Henderson's November 6, 2009 email to Niro indicated that Henderson's "device did not actually receive caller id automatically from the telephone network" and that it "did not operate." (Ex. 2.) On July 1, 2011, over 18 months after Henderson disclosed the lack of caller ID to Niro, Niro filed its Answer to HP's Counterclaims of inequitable conduct for filing false declarations with the PTO. In its Answer, contrary to what Henderson had told Niro, Niro denied that Henderson's prototype could not receive caller ID:

> 65. The "prototype" is unable to display caller ID, as required by the patents-in suit.
>
> **Response**: Denied. This allegation recites a conclusion of law as to what constitutes "display[ing] caller ID, as required by the patents-in-suit."

(Dkt. 112 at ¶ 65; *see also* ¶¶ 101, 273 (denying that the claimed invention was not demonstrated).) Niro also denied that the inventions described in numerous false declarations to the PTO were not actually reduced to practice:

> 50. Further, Henderson and Attorney Tendler submitted seven other Rule 131 declarations in support of related patent applications, in which Henderson swore that the inventions underlying those applications had been actually reduced to practice. Those inventions were not actually reduced to practice either.
>
> **Response**: Denied.

(*Id.* at ¶ 50.) Yet, Niro admits it "unequivocally" knew in February 2010 that "Henderson did ***not*** have actual reduction to practice." (Dkt. 184 at 10.) Moreover, Niro denied that the declarations contained false and misleading statements:

> 119. The '824 Declaration contained false and misleading statements.
>
> **Response**: Denied.

(Dkt. 112 at ¶ 119; *see also* ¶¶ 133.) Of course, as the Federal Circuit held, "[i]t is undisputed that Mr. Henderson's original declaration was unmistakably false." *Intellect*, 732 F.3d at 1341.

Also in its Answer, Niro repeatedly asserts that Henderson created a device that was an actual reduction to practice of the '862 patent:

> ***Henderson actually reduced to practice inventions of U.S. Patent No. 6,278,862***, as ***Henderson developed a functional prototype*** that received a message from a message originator, had a database of communicants that included information such as name, telephone number, and other information, and included a display that could show a name and telephone number upon receipt of a wireless signal, which was demonstrated to Kazuo Hashimoto in July of 1993.

(Dkt. 112 at ¶¶ 66, 100, 106, 125, 139, 158, 176, 185, 194, 203, 210, 263, 272, 314.) Niro knew this story was false because the only independent claim on the '862 patent requires "automatically passing said ***caller-identification information***" and "receiving ***caller-identification information*** … at said portable communication device," which Henderson explicitly informed Niro his device could not perform (*i.e.*, the "device did not actually receive caller id").[1] (Ex. 2; Ex. 31 at 2-3.) Thus, Niro reinforced and perpetuated the false and misleading statements from the Complaint and Amended Complaint in its Answer to HP's inequitable conduct allegations. Niro's misconduct extends beyond quoting articles it knew to be

[1] A required element of every claim in Henderson's patents is the receipt or transmission of caller ID. (*See, e.g.*, Exs. 29-32.)

false and misleading. Niro personally engaged in a pattern of deceit and obfuscation throughout this lawsuit.

## III. Argument

### A. HP's Motion is Timely

HP brought its motion promptly and within a reasonable time after discovery of the facts supporting sanctions and attorneys' fees against Niro. It was not until June 2014 that Niro produced documents showing a basis for Rule 11 sanctions and attorneys' fees against Niro. (Ex. 40.) Under Rule 11, a motion for sanctions can occur after the Court dismisses the case. *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 396 (1990); *Baker v. Alderman*, 158 F.3d 516, 523 (11th Cir. 1998); *Metrocorps, Inc. v. E. Mass. Junior Drum & Bugle Corps Ass'n*, 912 F.2d 1, 3 (1st Cir. 1990); *In re Kunstler*, 914 F.2d 505, 512-13 (4th Cir. 1990); *Smart Options, LLC v. Jump Rope, Inc.*, No. 12-cv-2498, 2013 WL 500861, at *3 (N.D. Ill. Feb. 11, 2013); *Lucka v. United Parcel Serv.*, No. 1:07-cv-1497, 2008 WL 2346147, at *2 (S.D. Ind. June 6, 2008). Sanctions will normally be decided after judgment, if based on pleadings: "[I]t is anticipated that in the case of pleadings the sanctions issue under ***Rule 11 normally will be determined at the end of the litigation*** …." *Lanphere v. 1 Corp.*, No. 10-cv-4774, 2012 WL 1965436, at *3 (N.D. Ill. Apr. 23, 2012) (quoting Fed. R. Civ. P. 11, 1983 Advisory Committee notes) (emphasis added). "Rule 11 contains no explicit provision setting the proper time for bringing a motion for sanctions." *Id.* Moreover, the Advisory Committee notes to Rule 11 require a motion only after discovering the basis for the motion: "A party seeking sanctions should give notice to the court and the offending party promptly ***upon discovering a basis for doing so***." Fed. R. Civ. P. 11, 1983 Advisory Committee notes (emphasis added); *see also Divane v. Krull Elec. Co., Inc.*, 200 F.3d 1020, 1025 (7th Cir. 1999). The reasonableness of the timing of a Rule 11 motion is

necessarily dictated by the specific facts and circumstances in a given case. *Kunstler,* 914 F.2d at 513; *Lanphere*, 2012 WL 1965436, at *3.

Moreover, the legal authority Niro relies upon is not on point and does not address the situation where the discovery of a basis for attorneys' fees occurred after judgment. In *Sullivan v. Hunt*, 350 F.3d 664 (7th Cir. 2003), and *Kaplan v. Zenner*, 956 F.2d 149 (7th Cir. 1992), the request for sanctions and attorneys' fees was based on legally insufficient pleadings, which was the basis for dismissal. *Sullivan*, 350 F.3d at 665; *Kaplan*, 956 F.2d at 150. The defendant knew this information at the time of dismissal; it was not concealed and discovered at a later date. The court in *Kaplan* even acknowledged that the reasonableness of the timing of the request under Rule 11 depends on the facts of the case. *Kaplan*, 956 F.2d at 152. Moreover, this District has specifically excluded Rule 11 motions and other sanctions provisions from the 90-day limit for bringing a motion. *See* Local Rule 54.3(a) ("Unless otherwise ordered by the court, this rule does not apply to motions for sanctions under Fed.R.Civ.P. 11 or other sanctions provisions.").

Likewise, the legal authority Niro relies upon discussing time limits for bringing a motion for attorneys' fees under 28 U.S.C. § 1927 and the court's inherent power is also not on point. In *XCO International*, the information justifying sanctions and attorneys' fees was known to the defendant at the time of dismissal, not concealed and discovered at a later date. *XCO Int'l Inc. v. Pac. Scientific Co.*, No. 01 C 6851, 2003 U.S. Dist. LEXIS 7286, 2003 WL 2006595, at *5 (N.D. Ill. Apr. 29, 2003). Further, in *XCO International,* the court focused on the time from the discovery of the conduct warranting attorneys' fees to the filing of the motion, not the time after judgment. *XCO Int'l*, 2003 WL 2006595, at *5. Moreover, other courts have specifically rejected time limits for bringing a motion for attorneys' fees under 28 U.S.C. § 1927 and the court's inherent power. *See Camarillo v. Pabey*, No. 2:05-CV-455, 2007 U.S. Dist. LEXIS

78585, at *19 (N.D. Ind. Oct. 22, 2007); *Smith v. CB Commercial Real Estate Group,* 947 F. Supp. 1282, 1285 (S.D. Ind. 1996) ("The timeliness parameters … set for Rule 11 sanction motions do not apply to section 1927 motions.").

Here, HP brought its motion promptly and within a reasonable time after discovery of Niro's misconduct in June 2014. Contrary to Niro's latest assertion, the Defendants, not Niro, sought to stay the case pending resolution of the inequitable conduct trial in the *HTC* case. (Dkts. 133-136.) After Judge Hart ruled that Henderson committed inequitable conduct, HP, not Niro, brought the decision to the Court's attention. (Dkt. 144.) The Court dismissed this case and delayed any attorneys' fees issues until after the Federal Circuit decided the appeal. (Dkts. 145, 150, 151.) On October 9, 2013, the Federal Circuit upheld Judge Hart's inequitable conduct determination. HP promptly filed a motion seeking fees against IW. (Dkts. 154, 168.)

While the attorneys' fees issue was pending, HP learned that Niro might have been aware of the false declarations to the PTO and inequitable conduct prior to filing this action (*i.e.*, the potential basis for Rule 11 sanctions). On May 9, 2014, HP requested that IW and Niro produce documents related to Niro's knowledge of inequitable conduct. (Ex. 39.) On May 28, 2014, Defendants filed a motion to compel such documents. (Dkts. 164, 165.) The Court granted Defendants' motion. (Dkt. 169.) Then, on June 3, 2014, Niro made a small production, but withheld a thousands of documents that this Court ordered produced relating to how Niro concocted its theory that Henderson's device or wooden shell mockups were somehow a working "picturephone." (Ex. 40.) During June and July 2014, Defendants sought additional discovery regarding Niro's knowledge of the false declarations, including serving subpoenas and filing its Adverse Inference Motion. (Dkts. 180, 181.) Since August 1, 2014, HP has been

awaiting the Court's ruling on the Adverse Inference Motion because any such ruling could impact HP's motion for fees and sanctions against Niro. (Dkt. 187.)

A Rule 11 motion can itself be the subject of sanctions awarded against the party bringing the motion. Fed. R. Civ. P. 11(b); *Feldman v. Olin Corp.*, 692 F.3d 748, 757, 759 (7th Cir. 2012). HP takes its obligations under Rule 11 very seriously. As such, prior to filing any motion, HP and its counsel had to obtain sufficient evidence to support its claim for sanctions. HP did not obtain such evidence until June 2014, so HP could not have filed a motion before that time. Until the Court's invitation in November 2014, HP felt the more prudent approach would be to await IW and Niro producing all of the relevant information prior to filing a motion. HP's approach sought to avoid multiple rounds of briefing on sanctions and attorneys' fees, which may be necessary depending on the Court's decision on the Adverse Inference Motion. If the Court does not consider HP's motion to be timely, then the Court is rewarding Niro for improperly concealing documents until after the case was decided on the merits. HP's concerted efforts to obtain documents supporting sanctions since learning of Niro's knowledge of and involvement in IW's inequitable conduct, and the short time period between June 2014 and the filing of HP's motion, demonstrate that it is timely.

**B. The Court Should Sanction Niro Under Rule 11**

1. Niro Admits It Did Not Investigate the False Declarations Prior to Suit

Rule 11 required Niro to conduct "an inquiry reasonable under the circumstances" prior to filing its complaint in this lawsuit. Fed. R. Civ. Proc. 11(b). "[W]hat constitutes a reasonable inquiry may depend on such factors as how much time for investigation was available to the signer; whether he had to rely on a client for information as to the facts underlying the pleading …; whether the pleading …was based on a plausible view of the law; or whether he depended on forwarding counsel or another member of the bar." *Id.*, 1983 Advisory Committee Notes.

It is undisputed that Niro was on notice of Henderson's false declarations on September 23, 2010, one month before it filed the Complaint in this suit. (Ex. 34.) Despite this, Niro readily admits that it never spoke to or discussed the false declarations with Henderson or Tendler prior to filing this litigation. (Dkt. 235 at 10-11 ("The statement that the ***Niro firm had no discussions with Messrs. Henderson or Tendler*** about that Declaration ***before filing suit is true***.").) This statement is implausible given the mountain of documentary evidence: (1) numerous documents showing Niro actively communicating with Henderson via phone, fax, and email at the time of the false declarations (Exs. 3-8); (2) Tendler and Henderson agreed to consult Niro regarding the false declarations (Ex. 1); (3) Henderson informed Niro in writing that there was no transmission of caller ID, which all of the patents require (Ex. 2); (4) Niro pursued licensing and litigation against other companies for over three years prior to filing this suit (Ex. 26). Niro expects the Court to believe that in three years of licensing and litigation, it never discussed with its client the key declarations that were successful in defrauding the PTO into issuing the patents. This position is simply unfathomable. If, however, the Court credits Niro's position, then Niro's failure to discuss the false declarations with the inventor and prosecuting attorney on the patents demonstrates Niro's utter lack of any reasonable investigation.

Niro has failed to produce any evidence other than self-serving declarations to show its investigation into HTC's inequitable conduct allegations. In fact, Niro has not produced a single document showing any investigation or analysis of the false declarations and inequitable conduct allegations. The Court ordered Niro to produce these documents showing its knowledge of and investigation into the false declarations and inequitable conduct prior to filing this suit (or anytime thereafter), but these documents have been improperly withheld. (Dkt. 169.) As stated in Defendants' Adverse Inference Motion (Dkts. 181, 187), the failure to produce any documents

on the investigation despite a Court order to do so is evidence that Niro did not in fact conduct "an inquiry reasonable under the circumstances," as Rule 11 requires.

The lack of documents showing an investigation combined with Niro's admission that it did not even discuss the false declarations and inequitable conduct with Henderson and Tendler justifies the Court sanctioning Niro under Rule 11 for failure to conduct an adequate pre-suit investigation.

2. Niro Cannot Claim Reliance on Henderson for False and Misleading Statements

Despite reciting a paragraph of case law that an attorney can rely on its client, Niro does not offer any evidence that Henderson did not tell Niro the declarations were false, including no documents and not even a self-serving declaration statement.[2] In addition, Niro has not produced a single document showing that it conducted an investigation into HTC's inequitable conduct allegations, which would also justify fees. *Ins. Benefit Adm'rs, Inc. v. Martin,* 871 F.2d 1354, 1357 (7th Cir. 1989) (if documents contradict the client, an attorney cannot rely on the client's statements); *Merritt v. Int'l Ass'n of Machinists & Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2010) (attorneys have a continuing duty to investigate allegations); Fed. R. Civ. Proc. 11, 1993 advisory committee notes ("The rule continues to require litigants to 'stop-and-think' before initially making legal or factual contentions. It also, however, emphasizes the duty of candor by subjecting litigants to potential sanctions for insisting on a position after it is no longer tenable…."). Moreover, Niro's claim that it never discussed the declarations with Henderson or Tendler prior to filing this lawsuit is further evidence that Niro cannot excuse its actions by claiming it relied on Henderson.

---

[2] To the contrary, Henderson told Niro everything Niro needed to know to determine that the declarations were false and Niro buried its head in the sand and forged forward with the lawsuit.

3. The Niro Firm Should Be Liable for Its Actions in This Suit

Regardless of who signed specific pleadings, all of the individual Niro attorneys and the Niro firm can be liable for sanctions under Rule 11. Rule 11 explicitly requires a law firm to be liable for the actions of its attorneys: "[A] law firm must be held jointly responsible for a violation committed by its partner, associate, or employee." Rule 11(c)(1). Moreover, co-counsel can be liable for the actions of attorneys they supervise, "The revision permits the court to consider whether other attorneys in the firm, co-counsel, other law firms, or the party itself should be held accountable for their part in causing the violation." Fed. R. Civ. Proc. 11, 1993 Advisory Committee Notes. At the time of the Complaint, the signing attorney, Culig, had been a practicing attorney for two years. The other attorneys in the case had been practicing for 7, 13, 30, and 40 years. Undoubtedly, Culig was acting in concert with and being supervised by the more senior attorneys at the Niro firm involved in the litigation when filing the Complaint, Amended Complaint, and Answer to HP's counterclaims. The Niro firm should be responsible for the misconduct in this litigation.

**C. The Court Should Impose Sanctions Under Section 1927 or the Court's Inherent Authority**

Niro urges the Court not to exercise its authority under 28 U.S.C. § 1927 or the Court's inherent power, if the Court declines to impose sanctions under Rule 11. Rule 11, however, explicitly preserves the Court's ability to award attorneys' fees and sanctions under other authority. Rule 11 "does not inhibit the court in punishing for contempt, in exercising its inherent powers, or in imposing sanctions, awarding expenses, or directing remedial action authorized under other rules or under 28 U.S.C. § 1927." Rule 11, 1993 Advisory Committee Notes. If the Court declines to award sanctions under Rule 11, it should exercise its inherent

powers or section 1927 to award sanctions and attorneys' fees against Niro. *See id.*; *Chambers v. NASCO*, 501 U.S. 32 (1991).

The Court should award attorneys' fees against Niro under 28 U.S.C. § 1927 or the Court's inherent power based on Niro's "bad-faith conduct," "lack of care," and for raising "baseless claims despite notice of the frivolous nature of these claims." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013); *Tillman v. New Line Cinema*, 374 Fed. Appx. 664, 666-67 (7th Cir. 2010). Niro pursued this litigation despite knowing that Henderson's declarations were false, that Henderson's patents were procured through fraud, and that those false declarations made Henderson's patents unenforceable. (*See* Exs. 1-2; Ex. 9 at 3-4; Ex. 34.) Moreover, if Niro's statements are believed, Niro failed to discuss the declarations with Henderson or Tendler ***after*** being put on notice of those false declarations and inequitable conduct, and ***before*** filing this suit. (Dkt. 235 at 10-11; Exs. 34.) The Court should order Niro to be jointly and severally liable for HP's costs and attorneys' fees incurred defending this case.

**D. Niro Attempts to Distract The Court With Irrelevant Information**

Niro attempts to distract the Court from the information relevant to this motion by focusing on formal roles and irrelevant events.[3] But, the important inquiry is what Niro knew at the time it initiated this litigation and its actions in this litigation. Niro emphasizes that it was not Henderson's prosecution counsel, but Niro's formal role of litigation counsel rather than

[3] Niro attempts to drag the reputation of HP's counsel through the mud with irrelevant and misleading personal attacks. (Dkt. 235 at 13-14.) The Seventh Circuit explicitly prohibits such attacks. *See United States v. Mealy*, 851 F.2d 890, 904 (7th Cir. 1988) (attorneys "have an ethical obligation to refrain from personal attacks on opposing counsel."); *see also C&F Packing Co., Inc. v. Doskocil Cos., Inc.*, 126 F.R.D. 662, 667 n.3, 681 (N.D. Ill. 1989) ("[Niro] has defended Doskocil's motion for sanctions by accusing Doskocil's counsel of misrepresentations and misconduct … In the eyes of [Niro], accusations of misconduct apparently are merely one more tactical tool to be utilized in the pursuit of victory. The charges ultimately reflect much

prosecution counsel is insignificant since Niro knew all of the facts that rendered Henderson's declarations false prior to filing this suit. Niro also stresses that it did not receive a copy of the February 10, 2007 email until 2014, but Niro's knowledge of the facts making the declarations false and constituting inequitable conduct is the important inquiry.

## IV. Conclusion

Niro was on notice of the inequitable conduct allegations nearly a month before it filed this case. Niro knew the declarations were false and knew the patents had been procured through fraud on the PTO. Nevertheless, Niro filed and maintained this frivolous lawsuit. Niro took positions in its Answer to HP's counterclaims that exacerbated the false and misleading statements in its Complaint and Amended Complaint. Niro's motivation is all too clear. Because of its contingency arrangement with Henderson, Niro likely profited to the tune of $8-10 million from the misconduct relating to IW. (Exs. 11-26.) It is uncertain whether IW will be capable of paying any fee award. Henderson set up IW as a shell corporation funneling 98% of all license and settlement agreements, after attorneys' fees and costs, to Henderson. If these transfers have already taken place, HP may have difficulty (and will incur additional expenses) collecting the fees awarded against IW.

For the reasons stated above, in HP's Supplemental Authority, and in Dell's briefing, which is explicitly incorporated herein, the Court should order Niro to be jointly and severally liable for HP's costs and attorneys' fees incurred defending this case.

---

more on [Niro's] attitude toward the judicial process than they do on the conduct of Doskocil's counsel.").

Dated: December 4, 2014　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　By:　/s/ Stephen S. Korniczky
　　　　　　　　　　　　　　　　　　　　Stephen S. Korniczky
　　　　　　　　　　　　　　　　　　　　Martin R. Bader
　　　　　　　　　　　　　　　　　　　　Gray M. Buccigross
　　　　　　　　　　　　　　　　　　　　Matthew M. Mueller
　　　　　　　　　　　　　　　　　　　　SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
　　　　　　　　　　　　　　　　　　　　12275 El Camino Real, Suite 200
　　　　　　　　　　　　　　　　　　　　San Diego, CA  92130
　　　　　　　　　　　　　　　　　　　　Tel:　　(858) 720-8900
　　　　　　　　　　　　　　　　　　　　Fax:　　(858) 509-3691
　　　　　　　　　　　　　　　　　　　　skorniczky@sheppardmullin.com
　　　　　　　　　　　　　　　　　　　　mbader@sheppardmullin.com
　　　　　　　　　　　　　　　　　　　　gbuccigross@sheppardmullin.com
　　　　　　　　　　　　　　　　　　　　mmueller@sheppardmullin.com

　　　　　　　　　　　　　　　　　　　　Paul J. Korniczky
　　　　　　　　　　　　　　　　　　　　LEYDIG, VOIT & MAYER, LTD.
　　　　　　　　　　　　　　　　　　　　Two Prudential Plaza, Suite 4900
　　　　　　　　　　　　　　　　　　　　180 N. Stetson Avenue
　　　　　　　　　　　　　　　　　　　　Chicago, IL  60601-6731
　　　　　　　　　　　　　　　　　　　　Tel:　　(312) 616-5600
　　　　　　　　　　　　　　　　　　　　Fax:　　(312) 616-5700
　　　　　　　　　　　　　　　　　　　　pkorniczky@leydig.com

　　　　　　　　　　　　　　　　　　　　Attorneys for Defendants
　　　　　　　　　　　　　　　　　　　　**HEWLETT-PACKARD COMPANY and PALM, INC.**

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing document was served via ECF on the following:

Raymond P. Niro
Paul K. Vickrey
David J. Mahalek
Joseph Culig
NIRO, HALLER & NIRO, LTD.
181 West Madison Street, Suite 4600
Chicago, IL 60602
**Attorneys for Plaintiff**
**INTELLECT WIRELESS, INC.**


Date: December 4, 2014                                         /s/ Stephen S. Korniczky