**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| **INTELLECT WIRELESS, INC.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| v. ) | **No. 10 C 6763** |
| ) | |
| **SHARP CORPORATION, SHARP** ) | **Judge Rebecca R. Pallmeyer** |
| **ELECTRONICS CORPORATION** ) | |
| **HEWLETT-PACKARD COMPANY,** ) | |
| **PALM, INC., and DELL INC. ,** ) | |
| ) | |
| **Defendants.** ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On October 20, 2010, Plaintiff Intellect Wireless ("IW"), represented by attorneys at the law firm Niro, Haller & Niro ("Niro"), filed a complaint in this court against Defendants Sharp Corporation, Sharp Electronics Corporation (together "Sharp"), Hewlett Packard Company ("HP"), Palm, Inc., Dell, Inc., and Garmin International, Inc.,[1] alleging infringement of two of IW's patents. The court granted partial summary judgment of non-infringement to Defendants in March 2012, and then stayed the case pending Judge William Hart's ruling on an inequitable conduct defense asserted against IW in a related case brought to enforce the same patents, *see Intellect Wireless, Inc. v. HTC Corp.*, No. 09-cv-2945. Following a bench trial, Judge Hart concluded that IW's founder, Daniel Henderson, among other things, filed affirmatively false declarations with the United States Patent and Trademark Office. As a result, Judge Hart held the patents unenforceable due to inequitable conduct. *See Intellect Wireless, Inc. v. HTC Corp.*, 910 F. Supp. 2d 1056 (N.D. Ill. 2012). The Federal Circuit affirmed Judge Hart's ruling. *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339 (Fed. Cir. 2013).

---

[1] Plaintiff voluntarily dismissed its claims against Garmin in February 2011 after the parties reached a confidential settlement agreement. (*See* Stip. Order of Dismissal [71].)

After the Federal Circuit's affirmance, Defendants in this case moved for an award of fees against IW, *see* 35 U.S.C. § 285, and on May 30, 2014, the court granted that request, finding that a pattern of deceit rendered this case "exceptional" within the meaning of the statute's language.  In its opinion, the court noted that "[i]f trial counsel was indeed made aware of the false declarations, Rule 11 sanctions may also be a possibility."  (Op. & Order [168], hereinafter "Op.," 13 n.11.)  After conducting additional discovery, Defendants now assert that Niro's attorneys were aware of the false declarations, and therefore knew, or reasonably should have known, that the patents were invalid, but nevertheless forged ahead with this litigation. Defendants ask the court to award attorneys' fees [227] [233] against five attorneys at Niro— Joseph Culig, Paul Gibbons, David Mahalek, Raymond Niro, Sr., and Paul Vickrey—and the firm itself, under Rule 11, 28 U.S.C. § 1927, and the court's inherent authority.  Niro's attorneys maintain that the motion for sanctions is untimely and that none of their conduct in this case is sanctionable.  For the reasons explained below, the court concludes that sanctions under Rule 11 are procedurally barred, but counsels' conduct merits an award of sanctions against Paul Gibbons, David Mahalek, Raymond Niro, Sr., and Paul Vickrey under § 1927 and the court's inherent authority.

## **BACKGROUND**

In 2007, Daniel Henderson obtained the two patents[2] at issue in this case—U.S. Patent Numbers 7,266,186 (" '186 Patent") and 7,310,416 (" '416 Patent")—and assigned those

---

[2]      The patents, part of an extensive patent portfolio, describe a wireless portable communications device to receive caller identification information and a picture over a telephonic communications network; in other words, picture caller-id.  (Op. at 2.)  As Judge Hart explained in his inequitable conduct ruling,

[a]ll of the patent applications filed by Henderson considered in this case [including the '186 and '416 patents] are one family of patents claiming priority to the '862 patent [U.S. Patent No. 6,278,862] which has a priority date of January 5, 1994.  All of the applications were treated as one case heard by the same two examiners.  Accordingly, all of the Rule 131 declarations that were filed in the proceeding will be considered insofar as they may bear on the disputed issues.

patents to his company, Intellect Wireless ("IW"). (Op. at 2.) IW, represented by attorneys from the Niro firm, thereafter proceeded to enforce those patents aggressively, filing six federal law suits claiming infringement against a total of twenty-four defendants. (*Id.* at 2.) IW initiated this action against Defendants Sharp, HP, Palm, Dell, and Garmin in October 2010. Though the majority of the twenty-four defendants settled, including Garmin, the remaining Defendants here sought summary judgment, which this court granted in part and denied in part in March 2012. The court granted summary judgment on the direct infringement claims, but denied it with respect to induced infringement. (Mem. Op. & Order [132], 20.) Meanwhile, in a related case before Judge William Hart, *Intellect Wireless v. HTC Corp.*, No. 09-cv-2945, IW and another telecommunications company, HTC, proceeded to a bench trial. Just twelve days after this court's summary judgment ruling, Defendants filed a motion to stay the case pending Judge Hart's ruling on HTC's inequitable conduct allegations. The court granted the motion. (*See* Mar. 23, 2012 Minute Entry [136].)

After hearing evidence at the bench trial, Judge Hart held both the '186 and '416 patents unenforceable due to IW's inequitable conduct. *Intellect Wireless, Inc. v. HTC Corp.*, 910 F. Supp. 2d 1056 (N.D. Ill. 2012). That ruling was affirmed on appeal. *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339 (Fed. Cir. 2013). Specifically, Judge Hart found that Henderson filed a false Rule 131 Declaration[3] with the Patent and Trademark Office ("PTO") on February 9, 2007 in order to "swear behind" the priority date of another patent application, the "Albert patent," which had a priority date of February 10, 1993. *HTC Corp.*, 910 F. Supp. 2d at 1073–74; (Op. at 5.) The Declaration was submitted in the prosecution of a different patent—United

---

*HTC Corp.*, 910 F. Supp. 2d at 1061. Moreover, the "picture claims" in the '186 and '416 patents depend on the 7,257,210 ('210 patent) patent, which is also within the same patent family. *Id.* at 1065.

[3]    37 C.F.R. § 1.131 permits applicants to provide sworn statements of prior invention. *See HTC Corp.*, 910 F. Supp. 2d at 1058–59 (discussing Rule 131 and quoting the Federal Circuit's discussion of Rule 131 in *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572 (Fed. Cir. 1996)).

States Patent number 7,257,210 (" '210 patent")—which is part of Henderson's larger patent family, and upon which the "picture claims" in the '186 and '416 patents directly depend. *HTC Corp.*, 910 F. Supp. 2d at 1065.  In the Rule 131 Declaration, Henderson averred that his patent had priority because he had "conceived of the claimed invention prior to February 10, 1993 and did not abandon, suppress or conceal the invention from at least before February 10, 1993 to either an actual reduction to practice in July 1993 or to January 5, 1994, the filing date of this application" (Feb. 9, 2007 Rule 131 Decl., Ex. 1 to Dell's Mot. for Sanctions [228-1], hereinafter "Rule 131 Decl.," ¶ 4), and that his invention "was actually reduced to practice and was demonstrated at a meeting with Kazuo Hashimoto of Hashimoto Corporation in July of 1993" through a "working prototype," which transmitted a picture through a wireless network.   (Rule 131 Decl. ¶ 9.)

The day after submitting the Rule 131 Declaration, Henderson e-mailed his patent prosecution attorney, Robert Tendler (who is not associated with the Niro firm), admitting that the affidavit was false:  "I want to address what I perceive is a potentially lethal blow to the integrity and validity of my patent portfolio from the incorrect declaration faxed to the PTO on Friday."  (Henderson E-mail to Tendler, Feb. 10, 2007, Ex. 1 to Defs.' HP and Palm's Supplemental Auth. in Supp. of an Award of Fees against Atty's for IW [232-2], hereinafter "Henderson Feb. 10, 2007 E-mail.")   No evidence in the record explains what prompted Henderson's about-face, but he went on, stating that "the intellect device shown to Hashimoto in July 1993 HAD NO WAY of displaying a picture on a two line alphanumeric display, contrary to my recent inaccurate declaration."  (Henderson Feb. 10, 2007 E-mail.) (emphasis in original). Henderson expressed particular concern about the effect this false statement could have on subsequent enforcement litigation.  He explicitly observed that "allegations of fraud on the patent office will now be the easiest way to invalidate the entire patent portfolio . . . I fully expect that it will also introduce serious concerns for my litigation counsel."  (*Id.*)  Henderson directed Tendler to "contact Cliff Kraft at Niro's office to see what their take is on this development.  As

4

you suggested, it makes sense to discuss with them what they may recommend." (*Id.*)  Tendler replied, counseling that the situation "is fixable with complete candor with the USPTO," and suggesting that he and Henderson "address this on the phone" because "[t]here is no guarantee that this will not be discoverable."  (Tendler E-mail to Henderson, Feb. 10, 2007, Ex. 1 to Defs.' HP and Palm's Supplemental Auth. in Supp. of an Award of Fees against Atty's for IW [232-2].)  As Judge Hart recounted, Henderson and Tendler neither withdrew the affidavit nor corrected the false representations. Instead, they made a "series" of false and obfuscating statements and repeated the inaccuracies in subsequent declarations.  *HTC Corp.*, 910 F. Supp. 2d at 1073.  The initial false Rule 131 Declaration was never withdrawn and remains part of the patent prosecution history.  (*See generally* Excerpts from File History of U.S. Patent No. 7,257,210 [232-10], hereinafter "File History of '210 Patent.")

On receiving Judge Hart's ruling, the court initially dismissed this case without prejudice on September 12, 2012, pending the Federal Circuit's resolution of the appeal.  (*See* Sept. 12, 2012 Minute Entry [145].)  That order was amended, in part, on October 10, 2012, with the following language: "Case will be dismissed with prejudice 30 days after a Federal Circuit decision affirming Judge Hart's ruling.  In addition, Defendant will have leave to file a motion for an award of fees, if appropriate, 30 days after a ruling affirming Judge Hart's opinion."  (*See* Oct. 10, 2012 Minute Entry [150]; Oct. 11, 2012 Minute Entry [151].)  The Federal Circuit issued its opinion on October 9, 2013, *see Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339 (Fed. Cir. 2013), and on November 8, 2013 Defendants filed their motions for fees against IW pursuant to 35 U.S.C. § 285. (Defs.' Mot. to Declare Case Exceptional and Award Fees and Costs [154], hereinafter "Defs.' Mot. for Fees against IW.")  Defendants argued that the case was "exceptional" within the meaning of § 285 based on IW's inequitable conduct in the patent prosecution, its filing of a frivolous suit, and its improper settlement tactics.  (Op. at 9, 18.)  This court granted Defendants' motion on May 30, 2014.  (*Id.* at 18, 20.)  In its ruling, the court did "not resolve the question whether Plaintiff engaged in litigation misconduct but note[d] that

5

Defendants' concerns appear to be valid," (*id.* at 18), and flagged the possibility of sanctions against counsel if the Niro firm had been "made aware of the false declarations" and still brought the infringement claims in this case. (*Id.* at 13 n.11.) The court allowed additional discovery, and on the strength of the additional information, Defendants now contend that Niro's attorneys did know, or reasonably should have known, about the false Rule 131 Declaration before filing the complaint on October 20, 2010. As such, Defendants urge, sanctions should be levied against David Mahalek, Paul Vickrey, Ray Niro, Sr., Joseph Culig, and Paul Gibbons.

**I.    Niro's knowledge of the false Rule 131 Declaration**

**A.    Information available in 2007**

Defendants HP and Palm maintain that someone at the Niro firm must have known about the February 10, 2007 e-mail from Henderson to Tendler around the time Henderson sent it.[4] (HP and Palm's Supplemental Auth. in Supp. of an Award of Fees against Atty's for IW [232], hereinafter "HP and Palm Sanctions Mot.," 2.) These Defendants note Henderson's instruction that Tendler contact Cliff Kraft at the Niro firm to discuss the false declaration. (Henderson Feb. 10, 2007 E-mail.) Defendants note, further, that Henderson had frequent communication with the Niro attorneys throughout the patent prosecution process. (HP and Palm Sanctions Mot. at 2–3.) Pointing to correspondence, phone records, and billing records as evidence of extensive communication immediately before and after the false affidavit was submitted, HP and Palm contend that it is "inconceivable that Henderson and Niro never discussed the false declarations . . . " (HP and Palm Sanctions Mot. at 5.)

In particular, HP and Palm highlight three January 2007 memos that Henderson faxed to Ray Niro and Paul Vickrey, updating them on the patent prosecution. (*See* Jan. 24, 2007 Mem. from Henderson to Niro and Vickrey, Ex. 3 to HP and Palm's Sanctions Mot [232-4], hereinafter

---

[4]    Dell does not address whether Niro's attorneys knew about the February 10, 2007 e-mail, but rather focuses on evidence that Niro learned in 2009 and 2010 that Henderson's prototype of a wireless picture phone did not operate.

"Jan. 24, 2007 Mem."; Jan. 25, 2007 Mem. from Henderson to Niro and Vickrey, Ex. 4 to HP and Palm's Sanctions Mot [232-5], hereinafter "Jan. 25, 2007 Mem."; Jan. 29, 2007 Mem. from Henderson to Vickrey, Ex. 5 to HP and Palm's Sanctions Mot. [232-6], hereinafter "Jan. 29, 2007 Mem.")   The first memo reports that Henderson "had a blockbuster interview with the Patent examiner;" the examiner suggested certain additional claims would be allowed for patent application 11/050,370, another patent in the larger family of patents, but not one at issue in this case. (Jan. 24, 2007 Mem. at 1.)  Henderson attached the list of the additional allowed claims and asked Vickrey and Niro to "review the scope and the quality of the additional claims" to help prepare for future infringement suits.  (*Id.* at 1.)  The second memo included a list of "the prior art which has been cited and considered by the patent office in all of the to be allowed/issued cases."  (Jan. 25, 2007 Mem. at 1.)  Third, Henderson asked Vickrey for advice on incorporating Intellect Wireless in order to assign his pending patents to the company.  (Jan. 29, 2007 Mem. at 1.)   All three memos pre-date the February 10, 2007 e-mail correspondence between Henderson and Tendler about the false declaration.

HP and Palm also identify several pre-February 10 billing entries as evidence that Niro attorneys were "reviewing claims" of the new patents and conferring about enforcement strategies throughout January 2007.  (Niro Billing Records, Ex. 6 to HP and Palm's Sanctions Mot. [232-7], hereinafter "Niro Billing Records," 4–5.)   HP and Palm make much of the fact that on February 9, 2007, shortly after the false declaration was filed, Niro made three calls within one hour to Henderson.  (HP and Palm Sanctions Mot. at 2–3) (citing Niro Phone Records, Ex. 8 to HP and Palm Mot. [232-9], hereinafter "Niro Phone Records," N1047–49.)  HP and Palm speculate that during these calls, Niro must have prompted Henderson to send the February 10, 2007 e-mail to Tendler admitting the mistake and requesting that he correct it.   (HP and Palm Sanctions Mot. at 4.)   Moreover, Defendants note, Niro made several additional calls to Henderson throughout the remainder of February.  (Niro Phone Records at N1088, N1095, N1137–38.)

Niro counters with several declarations. Dr. Clifford H. Kraft, an electrical engineer who provides technical consultations for Niro and who was mentioned by name in Henderson's February 10, 2007 e-mail, avers that he "had no contact with, never met and never talked to Robert Tendler" from 2007 through 2012, nor did he have "knowledge of or ever [see] or receive[] a copy of the February 10, 2007 email from Henderson to Tendler," before January 2014. (Decl. of Clifford H. Kraft, Ex. E to Niro Resp. to Mot. for Adverse Inference [184-5], hereinafter "Kraft Decl." ¶¶ 1, 4, 9–10.) Ray Niro similarly asserts "[a]t no time during any meetings or telephone discussions that I had with Dan Henderson (or Robert Tendler) was I ever told about any February 2007 email exchange between Tendler and Henderson or of the February 10, 2007 Henderson email." (Decl. of Raymond P. Niro, Ex. D to Niro Resp. to Mot. for Adverse Inference [184-4], hereinafter "Ray Niro Decl." ¶ 9.) Paul Vickrey attests that in March 2009, he asked Tendler to send all of his documents related to the patent prosecution, but the documents Tendler actually sent did not include the e-mail, and neither Tendler nor Henderson ever disclosed the false declarations to Vickrey. (Decl. of Paul K. Vickrey, Ex. F to Niro Adv. Infer. Resp. [184-6], hereinafter "Vickrey Decl.," ¶¶ 2–3, 7; Decl. of Paul K. Vickrey, Ex. H to Niro Resp. to Dell's Mot. for Sanctions [234-8], hereinafter "Second Vickrey Decl.," ¶ 7; Niro Resp. to Mot. for Adverse Inference [184], hereinafter "Niro Adv. Infer. Resp.," 9; Vickrey E-mail to Tendler, Mar. 30, 2009, 10:45 AM, Ex. H to Niro Adv. Infer. Resp. [184-8], hereinafter "First Vickrey E-mail to Tendler"; Vickrey E-mail to Tendler, Mar. 30, 2009, 5:08 PM, Ex. G to Niro Adv. Infer. Resp. [184-7], hereinafter "Second Vickrey E-mail to Tendler.") David Mahalek similarly swears that he "was never made aware of any February 10, 2007 email exchange between Mr. Henderson and Mr. Tendler (or the substance of that email exchange) before it was produced to us by Mr. Tendler's attorney in January 2014." (Decl. of David J. Mahalek, Ex. F to Niro Resp. to Dell's Mot. for Sanctions [234-6], hereinafter "Mahalek Decl.," ¶ 9.) The Niro firm also asserts in its brief that "Tendler has admitted he did not follow Henderson's instruction and did not contact either Dr. Kraft or any lawyer at the Niro firm," but provides no citation to the

record in this case to support this assertion.  (Niro Adv. Infer. Resp. at 8.)  Finally, Niro contends that Defendants have no evidence that anyone at the Niro firm was aware of the false declaration or the February 10, 2007 e-mail.  (Niro Adv. Infer. Resp. at 7–9.)

Defendants respond that their lack of direct evidence is a result of Niro's failure to comply with court-ordered discovery, and urge the court to impose an adverse inference that Niro did in fact know about the false declaration in 2007 at the time it was made.  (*See* Defs.' Mot. for Adverse Inference or in the Alt. to Enforce Compliance with the Ct.'s June 2, 2014 Order [181], hereinafter "Defs.' Adv. Infer. Mot.")  The court fully addresses the adverse inference motion below (*see infra* Section III), but notes here that it is entirely plausible, given Henderson's pattern of deceit and Tendler's professional failings,[5] that Henderson and Tendler withheld or obscured the false declaration from the Niro attorneys in 2007 in order to pursue enforcement litigation.  In short, the court declines to make a finding that Niro's attorneys knew about the false declarations when they were submitted.

## B. Information Niro obtained from Henderson

Whatever happened or did not happen in 2007, Defendants urge that by 2009, Niro attorneys were on notice that the patents were fraudulently procured.  On November 6, 2009, nearly a year before IW filed its complaint in this case, Henderson sent a lengthy e-mail to Mahalek, Vickrey, and Gibbons, providing "Interrogatory Information" for one of the related cases.  (Henderson E-mail to Gibbons, Vickrey, and Mahalek, Nov. 6, 2009, Ex. 2 to Dell's Mot. for Sanctions [227-2], hereinafter "Nov. 6, 2009 E-mail.")  In that e-mail, Henderson disclosed that his 1993 prototypes were not operational:

---

[5] Tendler was suspended from practicing before the PTO in January 2014 for his involvement with the false statements contained in the false declarations.  The Massachusetts Board of Bar Overseers of the Supreme Judicial Court suspended Tendler as of September 22, 2014.  *In the Matter of Robert K. Tendler*, Proceeding No. D2013-17 (USPTO), available at http://efoia. uspto.gov/Foia/ReterivePdf?system=OED&fINm=0755_DIS_2014-01-08; Mass. Bd. of Bar Overseers, http://massbbo.org/bbolookup.php (search "Robert Tendler") (last visited Mar. 27, 2014).

> After researching the costs to build products, and due to limited finances, I decided to construct a prototype myself using a numeric pager manufactured by NEC and enclosing it in a prototype case along with a Sharp pocket autodialer. This device *did not actually receive caller id automatically* from the telephone network as there was no provision for it by the pager company I used at the time, but the basic idea for caller id with a name to a wireless device was demonstrable where upon receipt of a page within the device, a screen pop would show both the telephone number and the name of the person calling that was associated with the number that had called. During the demonstration *I also showed them a mock-up* of the intellect device that included a picture of someone sending a message which was a picture of myself. *It did not operate* but was used in conjunction to demonstrate what the invention could include.

(*Id.*) (emphases added.) Henderson also made explicit reference to his Rule 131 Declarations, stating "I had my wife at that time . . . witness and sign some conception drawings in January and February of 1993 that were referenced in my Rule 131 Declaration submitted to the patent office, which established my date of conception," and "[t]here was . . . one Company in Canada I recall that was impressed enough to ask for pricing and delivery information, which should be referenced in my 131 declaration." (*Id.*)

Additional e-mails from the *HTC* case are also relevant to the current dispute. On February 10, 2010, Mahalek e-mailed Henderson to discuss supplemental interrogatory responses to be submitted in that case, sending copies to Vickrey, Gibbons, and Ray Niro. (Mahalek E-mail to Henderson, Feb. 10, 2010, 5:27 PM, Ex. 8 to Dell's Mot. for Sanctions [227-5], hereinafter "Mahalek Feb. 10, 2010 E-mail.") Mahalek asked "was there ever an actual reduction to practice of any of the inventions?" (*Id.*) He explained that "[w]e've taken the position that there was a constructive reduction to practice with the filing of the first application and that your conception date is at least February 10, 1993 based on the Rule 131 Declaration, but I wanted to double check on actual reduction to practice." (*Id.*) In response to this inquiry, Gibbons forwarded to Mahalek, Vickrey, and Ray Niro, a copy of the November 6, 2009 e-mail, containing the information that Henderson's prototypes "did not operate." (Gibbons E-mail to Mahalek, Feb. 10, 2010, 5:32 PM, Ex. 8 to Dell's Mot. for Sanctions [227-5], hereinafter

"Gibbons Feb. 10, 2010 E-mail.")  There is no evidence of any response from Henderson himself to Mahalek's February 2010 e-mail.

Also included in Mr. Mahalek's February 2010 e-mail to Henderson were draft interrogatory responses, which included the following statements:  "There was not an actual reduction to practice of the inventions of the '186 patent or the '416 patent either before or after the constructive reduction to practice"  and "neither Daniel Henderson nor Intellect Wireless actually reduced to practice the inventions of the '186 patent or the '416 patent, accordingly Intellect Wireless does not have any products that are an actual reduction to practice of the '186 patent or the '416 patent."  (Mahalek Feb. 10, 2010 E-mail.)  These responses were ultimately included in IW's first set of supplemental responses to HTC's interrogatories in the *HTC* case, made on February 19, 2010.  (IW First Supplemental Resp. to HTC's First Set of Interrogatories, Ex. 33 to HP and Palm's Sanctions Mot. [232-34], 13, ¶ 1(b), 14, ¶ 1(f).)

It is plain from these e-mails, and now undisputed by the parties, that Niro's attorneys knew at least by February 2010, if not before, that there was no actual reduction to practice of Henderson's inventions.  (*See* Niro Adv. Infer. Resp. at 10) ("When they learned that Henderson's prototypes were not sufficiently operable to prove workability of his invention, the Niro lawyers prepared interrogatory answers in the HTC case [in February 2010] that unequivocally stated that Henderson did not have an actual reduction to practice . . . The interrogatory responses were clear and unambiguous – there was no actual reduction to practice.")  Moreover, as noted, Henderson had specifically referenced the Rule 131 Declarations in his November 2009 e-mail; and by February 2010, Mahalek stated that he identified the conception date "based on the Rule 131 Declaration."  (Mahalek Feb. 10, 2010 E-mail.)  Niro's attorneys therefore knew by February 2010 that the prototype did not operate and by that time had reviewed the Rule 131 Declarations submitted in the patent prosecution.

### C. HTC inequitable conduct allegations

On September 23, 2010, nearly one month before the complaint was filed in this case, HTC alerted attorneys Ray Niro, Mahalek, Gibbons, and Vickrey,[6] that HTC planned to amend its answer in the case before Judge Hart to include an inequitable conduct defense. (Sept. 23, 2010 Letter from Martin Bader to Mahalek, Ex. 34 to HP and Palm Sanctions Mot. [232-35], hereinafter "Sept. 23, 2010 Letter," 1.) The letter from HTC's attorneys, Martin Bader and Stephen Korniczky of Sheppard Mullen Richter & Hampton—who also represent Defendants HP and Palm in this case—provided details in support of that defense: the letter asserted that "Mr. Henderson and the prosecuting attorney, Mr. Tendler, knowingly submit[ed] false 131 declarations to the patent office in order to obtain an allowance of the patents-in-suit." (Sept. 23, 2010 Letter at 1; *see also id.* at 2 ("Mr. Henderson submitted numerous false and misleading 131 declarations to the USPTO in order to obtain allowance of the patents.").) The letter points out the contradiction between Henderson's Rule 131 Declaration and IW's First Supplemental Response to HTC's first set of Interrogatories, noting that in the declaration, "Mr. Henderson falsely represented that he actually reduced the invention to practice. . . . However, when Mr. Henderson recently verified Intellect's interrogatory responses, he unequivocally confirmed that the claimed invention was never actually reduced to practice." (*Id.* at 2–3.) HTC concluded that "the patents-in-suit are invalid and unenforceable, at a minimum, based on the false and misleading 131 declarations that Mr. Henderson and Mr. Tendler submitted in order to obtain allowance of the patents in suit." (*Id.* at 3.)

By November 5, 2010, HTC had filed its proposed amended answer including allegations of inequitable conduct. David Mahalek e-mailed Henderson the same day, notifying him that HTC

---

[6] Culig was not copied on the e-mail containing the September 23 letter. (*See* Bader E-mail to Mahalek, Niro, Gibbons, and Vickrey, Sept. 23, 2010, 2:54 PM, Ex. 34 to HP and Palm Sanctions Mot. [232-35].)

> added an inequitable conduct counterclaim. Their allegation is that the patent office was mislead [sic] by the Rule 131 declarations which state, in one paragraph, that there was an actual reduction to practice. We'll counter with the argument that the majority of the declaration refers to a constructive reduction to practice, so the examiner could not have been misled. Their allegations are pretty detailed, so read through them. We'll need to answer once it's filed.

(Mahalek E-mail to Henderson, Nov. 5, 2010, Ex. 3 to Dell Sanctions Mot. [227-3], hereinafter "Nov. 5, 2010 E-mail.") Again, there is no evidence in the record of any response to this e-mail from Henderson.

### D. Other pre-trial investigations

According to Ray Niro, Niro's attorneys conducted extensive investigations, including repeated interviews of Mr. Henderson and Tendler, before filing the complaint in this case. (Decl. of Raymond P. Niro, Ex. I to Niro Resp. to Dell Sanctions Mot. [234-9], hereinafter "Second Ray Niro Decl.," ¶ 2.) The only evidence of this activity appears in the declarations of Niro's attorneys: Niro has not produced any notes or other work-product to corroborate its account of these meetings, despite discovery requests from Defendants, which the court discusses below. (*See infra* Section III.)

Niro attorneys first met to discuss Henderson's patents at a five-hour session on November 15, 2007. (Ray Niro Decl. ¶ 3.) In attendance were Henderson, Professor Jay Kasen from the University of Illinois, Ray Niro, Vickrey, Brady J. Fulton,[7] and Gibbons. (*Id.*) During the meeting, the Niro attorneys "review[ed] Mr. Henderson's patents in the presence of skilled engineers and experienced lawyers . . . stud[ied] the procurement of the patents from the Patent Office . . . and . . . determine[d] whether there was a good-faith basis to assert claims for patent infringement." (*Id.* ¶ 4.) The attorneys concluded there was a good-faith basis to pursue licensing opportunities, but Ray Niro ordered further investigation before filing any infringement claims. (*Id.* ¶¶ 4–5.) Gibbons, Mahalek, and Fulton spearheaded the investigation, producing

---

[7] Defendants have not moved for sanctions against Mr. Fulton, who is no longer with the Niro Firm.

claim charts, conducting interviews of technical experts, repeatedly interviewing Henderson and Tendler, and reviewing documents from the patent prosecution. (*Id.* ¶¶ 5–6.) Niro also sought independent advice from law school professors. (*Id.* at ¶ 5; Second Ray Niro Decl. ¶ 2.) Altogether, the Niro attorneys allegedly spent "hundreds of hours" ensuring there was a good faith basis to bring patent infringement claims. (Ray Niro Decl. ¶ 6.)

Based on the patent prosecution history, Niro's attorneys determined that Henderson had two independent grounds to claim priority of Henderson's invention: constructive reduction to practice based on the date the patent application was filed, and actual reduction to practice. (Second Ray Niro Decl. ¶¶ 2–3.) Notably, Ray Niro does not explain what led the Niro attorneys to conclude there was an actual reduction to practice. But as Ray Niro explains, he and his colleagues were not overly concerned about actual reduction to practice because they understood that

> as a matter of patent law, that if there was a constructive reduction to practice that predated the Albert prior art patent, the question whether or not there was also an actual reduction to practice became irrelevant. In other words, it did not matter whether or not Mr. Henderson had a fully operable prototype or an actual reduction to practice, so long as the filing of his patent application predated the Albert prior art.

(Second Ray Niro Decl. ¶ 3; *see also* Mahalek Decl. ¶ 5 ("Because Mr. Henderson had a constructive reduction to practice, I believed that fact made questions of an actual reduction to practice moot."); Niro Resp. to Dell's Mot. for Sanctions [234], hereinafter "Niro Resp. to Dell Sanctions Mot.," 8 (even if there was no actual reduction to practice "as a matter of law, if Mr. Henderson had a constructive reduction to practice, that alone provided a good-faith basis for" the litigation.).)

Once HTC raised its allegations of inequitable conduct, however, Vickrey avers that "additional extensive investigation was made into the file histories of the patents as well as discussions with both Henderson and Tendler regarding HTC's affirmative defense and counterclaim of inequitable conduct." (Vickrey Decl. ¶ 10.) Niro also retained an expert, John

Love, to review the file histories and the Rule 131 Declarations, and to opine about the inequitable conduct defense; Vickrey asserts that in Love's opinion, inequitable conduct had not occurred. (*Id.*) According to Vickrey, while Vickrey was preparing Tendler for his April 15, 2011 deposition, Tendler explained that he had "revised the 131 Declaration after receiving a telephone call from Mr. Henderson in which Mr. Henderson stated that he was uncomfortable about stating that his device could display a picture." (*Id.* ¶ 4.) In his discussions with Henderson, Vickrey reports, Henderson disclosed that though he believed the Rule 131 Declaration was true when he signed it, upon further reflection he was unsure whether he had an actual reduction to practice and asked Tendler to correct the Declaration. (*Id.* ¶ 11.)

## II. Alleged Misconduct

### A. False statements in the *HTC* case

Defendants contend that Niro's attorneys made several false statements on behalf of IW in the *HTC* case. For example, in February 2011, the Niro firm filed a second supplemental response to HTC's interrogatories, stating that

> there may also be an actual reduction to practice earlier than the date of constructive reduction to practice as Mr. Henderson created a working prototype with functional electronics which he showed at the Winter Consumer Electronics Show in January 1994. This prototype presently resides in the collection of the Smithsonian Institution. Other non-functioning mock-ups of Mr. Henderson's invention were also created. These, too, are part of the Smithsonian collection.

(IW Second Supplemental Resp. to HTC's Interrogatories, Ex. 7 to Dell Sacntions Mot [228-4], hereinafter "IW Second Supp. Resp. to HTC Interrogatories," 16.) As Judge Hart concluded, none of the items in the Smithsonian collection actually operated and IW's references to the Smithsonian acquisitions were "misleading and false," as two of the three prototypes in the Smithsonian collection are mere imitations of a picturephone, one made of wood, the other of plastic. *HTC Corp.*, 910 F. Supp. 2d at 1068, 1073. Moreover, during the June 2012 trial before Judge Hart, Henderson testified, in response to a question, that it was "true" that he has "never built any device in the history of [his] work that can transmit a picture." *Id.* at 1068.

Defendants contend that the approach taken by IW's attorneys in the *HTC* case was a calculated effort to obfuscate the fact that Mr. Henderson never actually reduced his invention to practice. They point to a February 25, 2011 e-mail conversation between Henderson and Mahalek in which Henderson, after reviewing the second supplemental interrogatory responses, asked, "I guess we are then taking the position that there was no actual reduction to practice?" (Henderson E-mail to Mahalek, Feb. 24, 2011, 11:12 PM Ex. 6 to Dell Sanctions Mot. [227-4], hereinafter "Henderson Feb. 24, 2011 E-mail.") Mahalek responded, "We're not taking the position that it wasn't an actual reduction to practice. We're trying to be more circumspect than that and convey an impression that we're unsure. If you think that doesn't come across in the answers let me know." (Mahalek E-mail to Henderson, Feb. 25, 2011, 7:10 AM, Ex. 6 to Dell's Mot. for Sanctions [227-4], hereinafter "Mahalek Feb. 25, 2011 E-mail.") That is, while Niro has admitted that its attorneys knew as early as February 2010 that there was never an actual reduction to practice, they obscured that fact in the *HTC* case, suggesting instead that they were "unsure."

### B.    Alleged false statements made to this court

Defendants maintain that Niro attorneys made similar false and misleading statements to this court regarding actual reduction to practice and the functionality of the prototypes. They assert that the complaint and amended complaint contain a "false narrative about Mr. Henderson's supposedly working prototypes." (Dell Mot. for Sanctions [227], hereinafter "Dell Sanctions Mot.," 6.) They highlight paragraph 3 of the complaint, which states:

> Mr. Henderson's prototype for a wireless picturephone device was received as part of the permanent collection of the Smithsonian Institution in the National Museum of American History. In 2009, the magazine *PC Today* described Mr. Henderson's role in the history of the camera phone:
>
> > The idea of camera phones is as old as cameras and phones, but it wasn't until 1993, when Daniel A. Henderson put together a couple of prototypes, that the two started to converge in a meaningful way. Dubbed the "Intellect," Henderson's design was for a phone that could display pictures received wirelessly instead of taking pictures and sending them wirelessly.

16

(Compl. [1] ¶ 3; First Am. Compl. [57] ¶ 3.)  The quote from *PC Today* is an accurate one, which Defendants acknowledge, but it falsely suggests that Henderson had a working prototype in 1993.  As the court noted in its May 30, 2014 opinion: "Such statements are at a minimum misleading, and can fairly be read to imply that Henderson had created a working prototype of the patented inventions as early as 1993."  (Op. at 18.)

More significantly, Defendants maintain that each allegation of patent infringement in the complaint and amended complaint is a knowing false statement.  By the time the complaint was filed on October 20, 2010, Defendants argue, the Niro firm was on notice that the allegations in the complaint were baseless:  Henderson had informed the Niro attorneys that his prototypes did not actually work; Niro attorneys have admitted knowing that there was no actual reduction to practice; they had been alerted to the possibility of inequitable conduct by HTC's September 23, 2010 letter; and, according to Mr. Henderson's November 2009 e-mail, the Niro attorneys had reviewed the Rule 131 Declarations submitted in the patent prosecution.  Niro attorneys therefore knew or reasonably should have known that Henderson intentionally submitted a declaration that contained a materially false statement, constituting inequitable conduct that invalidated the patent.  Because an invalid patent cannot be infringed, Defendants maintain that each allegation of infringement in the complaint and amended complaint constitutes a false statement.  (Dell Sanctions Mot. at 9.)  At a minimum, Defendants argue, Niro attorneys were on notice of the inequitable conduct allegations before they filed the amended complaint on January 7, 2011, and failed to investigate those allegations before proceeding in this lawsuit. The amended complaint contained the same *PC Today* quote, again creating the impression that Henderson had produced working prototypes of his device when in fact he had not.

Further, Defendants assert, Niro attorneys continue to make false and contradictory statements to this court.  Specifically, HP and Palm point out, in a motion for a protective order signed by Vickrey on June 20, 2014, Niro asserts that it "had no discussions about the Rule 131

Declaration with Messrs. Henderson and Tendler before filing suit." (Pl.'s Objection to Subpoenas to Kraft, Harris and Wiggins and Mot. for Protective Order and to Quash [171], 1–2.) Niro has repeated this assertion in its response to these motions for sanctions: "The statement that the Niro firm had no discussions with Messers. Henderson or Tendler about that Declaration [the February 9, 2007 Rule 131 Declaration] before filing suit is true." (Niro Resp. to HP and Palm's Supplemental Auth. in Supp. of an Award of Fees against Atty's for IW [235], hereinafter "Niro Resp. to HP and Palm Sanctions Mot.," 9–10.) As the court understands that statement, Niro asserts that, while its attorneys reviewed other Rule 131 Declarations that Henderson submitted during the patent prosecution, no one reviewed the particular February 9, 2007 declaration. (*See id.*) However plausible that statement might be in the abstract, it is difficult to reconcile with Ray Niro's insistence that Niro's attorneys "stud[ied] the procurement of the patents from the Patent Office" (Ray Niro Decl. ¶ 4), or with Vickrey's assertion that, after learning of the inequitable conduct allegations from HTC, "additional extensive investigation was made into the file histories of the patents as well as discussions with both Henderson and Tendler regarding HTC's affirmative defense and counterclaim of inequitable conduct." (Vickrey Decl. ¶ 10.) As Defendants point out, the February 9, 2007 Declaration is itself part of the prosecution history of the '210 patent. (*See* File History of '210 Patent.) Though that '210 patent is not at issue in this case, the picture claims in the '186 and '416 depend on the allowability of the '210 patent application. *HTC Corp.*, 910 F. Supp. 2d at 1061. It is, therefore, implausible that Niro diligently studied the prosecution histories of the patents-in-suit but somehow missed the February 9, 2007 Declaration, which is contained within the relevant file history submitted to the PTO.

Finally, Defendants emphasize Niro's statement in response to the adverse inference motion that "the very first time the Niro firm saw HTC's inequitable conduct claim" was in November 2010, after the complaint in this case was filed. (Niro Adv. Infer. Resp. at 6.) This statement is unconvincing: the actual counterclaims were not filed until November, but Niro was

on notice of the company's allegations six weeks earlier.  The letter to Niro from HTC's counsel, sent on September 23, 2010, prior to filing the complaint in this case, presented detailed descriptions of the inequitable conduct allegations.  Niro's persistence in making inconsistent statements in this most recent round of briefing confirms the propriety of a sanction, in Defendants' view.

### III.    Adverse inference

If the court does not conclude that Niro lawyers knew about the false declaration, Defendants urge, the court should nevertheless grant their motion for an adverse inference that "attorneys Raymond P. Niro, Paul K. Vickrey, Paul C. Gibbons, David J. Mahalek, and Niro [] knew about the falsity of Daniel Henderson's Rule 131 Declarations prior to filing suit against Defendants and/or that Niro failed to conduct adequate pre- and post-filing Rule 11 investigations."  (Defs.' Adv. Infer. Mot. at 1.)  The basis for this adverse inference, they contend, is the failure on the part of Niro and IW to comply with court-ordered discovery.  *See* FED. R. CIV. P. 37(b)(2)(A) ("If a party . . . fails to obey an order to provide discovery . . . the court where the action is pending may . . . direct[] that . . . designated facts be taken as established . . . [or] prohibit[] the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence.").[8]

The discovery dispute in this case is intertwined with a discovery dispute in the *HTC* case.  On June 2, 2014, this court granted Defendants' motion to compel production of:

---

[8]      Niro contends that Defendants must show a willful destruction of evidence before the court may impose an adverse inference.  (Niro Adv. Infer. Resp. at 11.)  The court disagrees:  "The weight of authority . . . holds that the culpability of a party who fails to comply with a court order determines only which sanctions the court should impose and not whether any sanctions are appropriate at all."  *Halas v. Consumer Servs., Inc.*, 16 F.3d 161, 164 (7th Cir. 1994).  While willfulness, fault, or bad faith is required before a court dismisses a case based on discovery violations, *Watkins v. Nielsen*, 405 F. App'x 42, 44 (7th Cir. 2010), there is no similar requirement for the imposition of a lesser sanction such as an adverse inference: An appellate court will "uphold any exercise of the district court's discretion that could be considered reasonable."  *Maynard v. Nygren*, 332 F.3d 462, 467 (7th Cir. 2003).  All Defendants must show is that Niro "fail[ed] to obey an order requiring discovery."  FED. R. CIV. P. 37(b)(2)(A).

> any and all documents responsive to and/or ordered produced pursuant to Judge William Hart's January 30, 2014 Order granting HTC's Motion for Expedited Discovery in *Intellect Wireless Inc. v. HTC Corp., et al.*, No. 09-c-2945, Dkt. No. 258 (N.D. Ill.) (Hart, J.). . . . [and] any documents responsive to and/or ordered produced pursuant to Judge Hart's May 6, 2014 Opinion and Order. *Id.*, Dkt. No. 291.

(Defs. Mot. to Compel Discovery [164], 1; June 2, 2014 Order [169] (granting Defs.' Mot. to Compel by agreement).)   Judge Hart's January 30, 2014 order granted HTC's motion for expedited discovery.   Jan. 30, 2014 Minute Entry, *HTC v. Intellect Wireless*, No. 09-cv-2945 [258].   After entry of that order, Niro's attorneys refused to produce certain documents, claiming they were protected by attorney-client privilege.   (*See* Niro's Supplemental Privilege Log, Ex H. to Defs.' Mot for Adverse Inference [181-9], hereinafter "Niro Supp. Privilege Log.")   Judge Hart overruled that objection.   He concluded that IW forfeited the attorney-client privilege by its fraudulent conduct, and ordered Niro and IW to produce the documents.   Op. & Order, *HTC v. Intellect Wireless,* No. 09-cv-2945 [291], 4–5.   Defendants contend that, despite these court orders, IW and Niro still have not complied with the required discovery.   Defendants, therefore, ask this court to either enforce its June 2, 2014 order or impose an adverse inference that Niro's attorneys knew about the false declarations prior to filing suit.   (Defs.' Adv. Infer. Mot. at 6.)

### A.     Scope of the Discovery Request

This court's June 2, 2014 order required Niro and IW to produce every document that addressed by Judge Hart's January 30, 2014 and May 6, 2014 orders.   Judge Hart's January 30, 2014 order does not list the requested categories of documents; it simply grants HTC's motion for expedited discovery.   Jan. 30, 2014 Minute Entry, *HTC v. Intellect Wireless,* No. 09-cv-2945 [258] ("Defendant's motion for expedited discovery [254] is granted.").   Niro argues that the documents Defendants now seek are not covered by Judge Hart's orders and that the text of HTC's motion is therefore central to determining the scope of the discovery request.   (Niro Adv. Infer. Resp. at 2.)   The court will independently review the text of HTC's discovery requests, but notes at the outset that Judge Hart himself concluded that Niro's disclosures were

incomplete.  HTC raised the same arguments that Defendants do here, and Judge Hart agreed with HTC, concluding in his January 8, 2015 order that "Niro has not produced all of the documents sought, claiming relevancy as to some and that some documents are in the possession of IW," and determining further that an adverse inference was appropriate in these circumstances.  Op. & Order, *HTC v. Intellect Wireless,* No. 09-cv-2945 [343], 10.

HTC's motion requested ten categories of documents.  The introduction to that motion states:

> HTC respectfully seeks expedited discovery relating to Niro's knowledge of the declaration's falsity, misrepresentations to this Court, and bad faith prosecution of this baseless lawsuit. In particular, HTC seeks:
>
> 1. All documents relating to Niro's knowledge of the veracity of the Rule 131 declarations during the prosecution of the patents-in-suit.
>
> 2. All communications between Niro and Henderson and/or Tendler regarding the Rule 131 declarations prior to filing this lawsuit against HTC.
>
> 3. All documents relating to when Niro first became aware of the Rule 131 declarations.
>
> 4. All documents relating to when Niro first became aware that the February 9th Rule 131 declaration was false or inaccurate.
>
> 5. All documents relating to any advice and/or consultation that Niro provided to Henderson or IW regarding the Rule 131 declarations during the prosecution of any of Henderson's or IW's patent applications.
>
> 6. All communications between Niro and Cliff Kraft regarding the Rule 131 declarations prior to filing this lawsuit against HTC.
>
> 7. Phone records from February 2007 for any calls between the Niro firm and IW, Henderson, and/or Tendler.
>
> 8. All communications between the Niro firm and IW, Henderson, and/or Tendler during January through May 2007.
>
> 9. Invoices and/or any records of time spent by the Niro firm relating to work for Henderson and/or IW from January through May 2007.
>
> 10. Copies of any calendar appointments relating to Henderson, IW, and/or Tendler from January through May 2007.

HTC Mot. for Expedited Discovery, *Intellect Wireless v. HTC,* No. 09-cv-2945 [254], hereinafter "HTC Discovery Mot.," 5–6. Defendants' primary complaint in this case is that Niro and IW have failed to comply with requests 1 and 5. (Defs.' Adv. Infer. Mot. at 7.) Defendants identify several categories of documents that they maintain are responsive to these requests but have not been produced: (a) work product concerning HTC's inequitable conduct allegations, such as witness outlines; (b) work product relating to Niro's Rule 11 analysis; (c) communications between Niro, IW, and IW's appellate counsel in the *HTC* case relating to the inequitable conduct allegations; and (d) communications with the law professors hired to study the prosecution histories of the Henderson patents and HTC's claims of inequitable conduct. (*Id.* at 7–8.)

Niro responds that it was only obligated to comply with the requests numbered 7–10 and, further, that the documents Defendants now seek—"communications with experts, with law professors, [and] with Intellect Wireless's appellate counsel"—are not covered by any of the ten categories. (Niro Adv. Infer. Resp. at 2, 4.) To support its first claim—that Niro was required to respond only to requests numbers 7–10—Niro notes that before HTC filed its motion to re-open discovery in Judge Hart's case, Gray Buccigross, HTC's attorney, made a request via e-mail only for the first six categories of documents and suggested that HTC intended to seek to re-open and expedite discovery. (*See* Buccigross E-mail to Mahalek, Jan. 14, 2014, 12:22 PM Ex. A to Niro Adv. Infer. Resp. [184-1].) In response to Buccigross's e-mail, Vickrey, Mahalek, and Ray Niro held a telephone conference with HTC counsel on January 14, 2014 and explained:

> (1) that the Niro firm lawyers first saw the February [10], 2007 email on January 9, 2014, nearly seven years after it was written, and (2) that they had no discussions about the Rule 131 declarations with Henderson or Tendler before Intellect Wireless filed suit against HTC in May 2009.

(Niro Adv. Infer. Resp. at 4; Mahalek E-mail to Buccigross, Jan. 14, 2014, 3:13 PM, Ex. A to Niro Adv. Infer. Resp. [184-1].) That is, Niro's attorneys asserted that no documents exist related to the first six requests. This prompted Buccigross to e-mail Mahalek, Ray Niro, and Paul Vickrey later the same night, now "additionally seeking" four new categories of documents

(which would become requests 7–10) and warning again that if Niro and IW failed to comply, HTC would formally move to re-open discovery. (Buccigross E-mail to Mahalek, Jan. 14, 2014, 10:53 PM, Ex. A to Niro Adv. Infer. Resp. [184-1].) When Niro did not produce any documents within a week, HTC proceeded to move Judge Hart to re-open discovery. HTC Discovery Mot. Judge Hart granted HTC's motion on January 30, 2014. Jan. 30. 2014 Minute Entry, *HTC v. Intellect Wireless*, No. 09-cv-2945 [258].

Niro justifies its refusal to produce documents by noting that in "the argument section of the motion where [HTC] actually requested documents to be produced, HTC only mentioned four categories of documents." (Niro Adv. Infer. Resp. at 5.) The section of the motion that Niro relies on states:

> [T]o the extent that the Court feels additional discovery would aid in its decision to award fees, then HTC requests the following expedited discovery:
>
> 1. Phone records from February 2007 for any calls between the Niro firm and IW, Henderson, and/or Tendler.
>
> 2. All communications between the Niro firm and IW, Henderson, and/or Tendler during January through May 2007.
>
> 3. Invoices and/or any records of time spent by the Niro firm relating to work for Henderson and/or IW from January through May 2007.
>
> 4. Copies of any calendar appointments relating to Henderson, IW, and/or Tendler from January through May 2007.

HTC Discovery Mot. at 12–13. Niro's quotation is accurate, but its argument that HTC's request was limited to these four categories is weak. First, as described above, the introduction to the motion specifically requests all ten categories of documents. Second, the section of the motion Niro relies on is presented only after HTC's attorneys describe how Niro attorneys claimed they "do not have, and never have had, documents responsive to HTC's requests [1–6]." HTC Discovery Mot. at 10. Third, the Niro attorneys' contemporaneous conduct shows that they understood that the January 30, 2014 order covered all ten requests: On March 3, 2014, Niro filed a "Supplemental Privilege Log" in response to request number five, an action inconsistent

with the position that they were required only to respond to requests 7–10. (Niro Supp. Privilege Log; First Supplemental Compliance with Jan. 30, 2014 order, Ex. J to Buccigross Decl. [181-11].) In any event, HTC's subsequent motion to compel production of allegedly privileged documents—which Judge Hart granted on May 6, 2014, *see* Opinion and Order, *Intellect Wireless v. HTC,* No. 09-cv-2945 [291]—lists all ten categories of documents. HTC Mot. to Compel Production of Allegedly Privileged Docs. *Intellect Wireless v. HTC*, No. 09-cv-2945 [276], hereinafter "HTC Mot. to Compel," 2–3. Any ambiguity regarding the scope of the January 30, 2014 discovery order was eliminated by Judge Hart's May 6, 2014 opinion stripping IW of its attorney-client privilege and ordering production of the documents: By the time this court ordered discovery on June 2, 2014, Niro was obligated to comply with all ten requests.

Niro next argues that the requests for "communications with experts, with law professors, [and] with Intellect Wireless's appellate counsel" are not covered by any of the ten categories because the requests are time-limited. (Niro Adv. Infer. Resp. at 2, 4.) Defendants respond that request 5 covers documents generated while *any* of Mr. Henderson's patents were being prosecuted, which extends through June 25, 2013, when Mr. Henderson's most recent patent was granted. (U.S. Patent No. 8,472,595, Ex. I to Defs.' Adv. Infer. Mot. [181-10].) The court agrees with Defendants: when Niro retained John Love to review the file histories and the Rule 131 Declarations, and opine about the inequitable conduct defense, Niro's communications with Love and his final opinion constitute "documents relating to . . . advice and/or consultation that Niro provided to Henderson or IW regarding the Rule 131 declarations." Likewise, communication with Henderson and IW's appellate counsel regarding the appeal to the Federal Circuit—which revolved around the inequitable conduct allegations and the veracity of the Rule 131 Declarations—are likewise documents "relating to advice" regarding the Rule 131 Declarations. Niro's claim that the documents are not covered by these requests is unsupported.

### B.    Niro's disclosures

In response to Judge Hart's May 6, 2014 ruling, Niro produced a set of documents on June 5, 2014.  (June 5, 2014 Niro Production Cover Letter, Ex. A to Supp. Mem. in Opp. to Defs.' Adv. Infer. Mot. [270-1].)[9]  This early June production contained the November 2009 e-mail from Henderson stating that the prototype "did not operate," the February and the November 2010 e-mails regarding interrogatory responses for the *HTC* case, and the February 2011 e-mails explaining Niro's strategy of "circumspect[ion]" concerning actual reduction to practice.  On June 11, 2014 Defendants sent Niro and IW—by this time also represented by Kulwin, Masciopinto & Kulwin, LLP ("KMK")—a letter identifying the deficiencies in Niro and IW's production.  (Letter from Martin Bader to Robert Cummins and Shelly Kulwin, June 11, 2014, Ex. A to Buccigross Decl. [181-2].)  That letter requested, in connection to requests 1 and 5: "any work product relating to the declarations, HTC's inequitable conduct allegations, Henderson's intent and/or the materiality of the declarations," produced in opposition to summary judgment or in preparation for trial; the Rule 11 analysis Niro conducted; communications between Niro and IW's appellate counsel, any communication with the professors Niro hired; and invoices relating to the Rule 131 Declarations.  (*Id.* at 1–2.)  On June 16, 2014, Vickrey responded with a letter repeating Niro's position that it was required only to respond to requests number 7–10.  (Letter from Paul Vickrey to Graham Buccigross, June 16, 2014, Ex. C to Buccigross Decl. [181-4], 2.)  IW's counsel, KMK, responded to the discovery requests on June 17, 2014, producing a single, seven-page document—an invoice from Niro to IW in a related case—and further asserting that "IW has no additional documents within their possession that it has not already produced except those within the possession of the Niro Firm

_____

[9]    Defendants HP and Palm urge the court to strike Niro's Supplemental Memorandum in Opposition to the Motion for Adverse Inference. (Defs. HP and Palm's Opp. to Niro's Mot. for Leave to File Supp. Mem. in Opp. to Mot. for Adv. Inf. [272].)  They urge that it was improperly submitted after briefing had closed and note that the arguments contained in the motion could have been made earlier.  (*Id.* at 1.)  The court declines to strike the Supplemental Memorandum, but it does not alter the court's analysis.

with respect to all matters at issue." (June 17, 2014 Letter from Kulwin to Paul Korniczky, Ex. E to Adv. Inf. Mot [181-6].)

Despite Vickrey's assertion that its obligation to respond was limited to four requests, Niro now maintains that it has complied with the complete list of discovery requests. (*See* Niro Adv. Infer. Resp. at 2, 6; Niro Supp. Mem. in Opp. to Mot. for Adverse Inference [270-1], 1–2.) Niro points out that in response to request number 5, the firm "produced 2010 emails which confirm that it had no knowledge of any false declaration." (Niro Adv. Infer. Resp. at 6.) Specifically, the firm notes (1) the February 10, 2010 e-mail in which Mahalek asks Henderson "was there ever an actual reduction to practice of any of the inventions?" and (2) the November 5, 2010 e-mail from Mahalek informing Henderson of HTC's inequitable conduct counterclaim. According to Niro, that November 5, 2010 e-mail is "the very first time the Niro firm saw HTC's inequitable conduct claim" and thus confirms that Niro had no knowledge of the Henderson-Tendler e-mail or the false declaration prior to that date. (*Id.* at 6–7.)

As explained earlier, however, HTC sent a letter to the Niro attorneys on September 23, 2010—roughly six weeks before the November 5 e-mail and prior to filing the complaint in this case—warning counsel about the inequitable conduct allegations and bringing the false declaration to Niro's attention. And, of course, the fact that Mahalek notified Henderson of the counterclaim on November 5 sheds no light on when Mahalek himself first learned of it. In any event, these two 2010 e-mails, which show Mahalek equivocating on Niro's position regarding actual reduction to practice, do not satisfy the court that Niro learned about the false declarations only after filing the complaint in this case.

On this record, the court is uncertain that Niro has in fact turned over all of the requested documents, but ultimately declines to adopt the requested adverse inference. Such an adverse inference is unnecessary because the evidence that has been presented—even if it is an incomplete record—sufficiently establishes that Niro's attorneys either knew, or reasonably should have known, about the false declaration prior to filing the complaint in this case and have

continued to make misleading representations about the extent of their knowledge. Notably, Niro represented as recently as February 13, 2015 that "[n]obody at the Niro firm knew about the February 9, 2007 declaration and/or its inaccuracies prior to filing suit" on October 20, 2010. (Niro Supplemental Mem. in Opp. to Mot. for Adv. Inf. at 3.) Yet HTC's attorneys alerted Niro to the false declaration on September 23, 2010. Even if no one at Niro had knowledge of the false declaration prior to September 23, 2010, Niro's failure to investigate those allegations before filing yet another enforcement action was, at best, careless. Niro's own representations that it lacked knowledge of the false declaration, combined with HTC's September 23, 2010 letter notifying Niro of the inequitable conduct allegations are sufficient for the court to rule on the issues before it without resorting to an adverse inference.

*       *       *

After the parties completed briefing on the adverse inference motion, Dell filed its current motions for sanctions against Niro on October 20, 2014. (Dell Sanctions Mot.) HP and Palm joined Dell's motion and submitted separate briefing on November 6, 2014. (Defs. HP and Palm's Notice of Joinder and Joinder in Dell's Mot. for Sanctions [231]; HP and Palm Sanctions Mot.) Sharp joined Dell and HP's motions on November 6, 2014. (Sharp Corp.'s and Sharp. Electronics Corp.'s Notice of Joinder in Mots. for Sanctions [233].) The court turns to those motions now.

<strong><u>DISCUSSION</u></strong>

## I.    Timeliness

Niro argues that Defendants' sanctions motion is untimely and procedurally barred. As explained below, the court agrees with Niro that the Rule 11 motion is procedurally barred because Defendants did not comply with the safe harbor requirements of that rule. Failure to comply with the safe harbor provision, does not, however, bar a sanctions motion under § 1927 or the court's inherent authority, and the court concludes that the request for fees under § 1927

is timely because Defendants filed their motions as soon as practicable after discovering the misconduct.

### A. Defendants did not comply with Rule 11's safe-harbor requirement

Niro asserts that Defendants are barred from proceeding with Rule 11 arguments because the motion was filed two years after final judgment and did not comply with Rule 11's safe-harbor provision, which requires the moving party to give the non-moving party a 21-day window in which to withdraw the allegedly offensive pleading. (Niro Resp. to Dell Sanctions Mot. at 1–2; Niro Resp. to HP and Palm Sanctions Mot. at 1–3); FED. R. CIV. PRO. 11(c)(2). Niro's argument conflates the safe-harbor provision—a procedural requirement—with the rules governing timeliness. With respect to timeliness, Rule 11 does not establish a deadline for sanctions motions, but the Seventh Circuit has noted that 90 days after final judgment represents "the outer parameters" for filing such motions. *Sullivan v. Hunt*, 350 F.3d 664, 666 (7th Cir. 2003). A motion filed within 90 days of final judgment, however, is not automatically timely: the 90-day "limit will not necessarily protect a sanctions claim if the party bringing it has failed to do so within a reasonable amount of time." *Id.* at 666 (quoting *Kaplan v. Zenner,* 956 F.2d 149, 152 (7th Cir. 1992)).

Distinct from this court-established timeliness requirement, Rule 11 also imposes certain procedural hurdles that a moving party must clear before a court may consider a Rule 11 motion. FED. R. CIV. PRO. 11(c); *see Divane v. Krull Elec. Co.,* 200 F.3d 1020, 1025 (7th Cir. 1999) ("When sanctions are requested by a party's motion, Rule 11(c) . . . requires that two procedures be followed.") Relevant to this case, a party must "substantially compl[y] with Rule 11's safe-harbor requirement" by providing the non-moving party with notice of the misconduct and an opportunity to withdraw the offending pleading.[10] *Matrix IV, Inc. v. Am. Nat. Bank &*

---

[10] Rule 11 also requires that a "motion for sanctions . . . be made separately from any other motion." FED. R. CIV. P. 11(c)(2). "Permitting a motion for sanctions to be made in conjunction with another motion constitutes an abuse of discretion." *Divane,* 200 F.3d at 1025. Courts are split regarding whether a Rule 11 motion that also seeks sanctions under § 1927 and

*Trust Co. of Chicago*, 649 F.3d 539, 553 (7th Cir. 2011). Though Niro couches its argument in the language of timeliness, Niro has actually asserted two defenses to the Rule 11 motion: (1) that the motion is untimely because it was brought more than 90 days after final judgment, and (2) that the motion is procedurally barred because Defendants did not comply with the safe-harbor provision.

The court concludes that Defendants' Rule 11 motion is procedurally barred. The safe-harbor provision is set forth in Rule 11(c)(2) and requires that a movant either send a warning letter or serve a copy of the Rule 11 motion 21 days before actually filing the motion. *See Olson v. Reynolds*, 484 F. App'x 61, 64 (7th Cir. 2012); *Matrix IV, Inc.*, 649 F.3d at 552. The safe harbor gives the offending party an opportunity "to withdraw or correct the offending pleading." *Id.* "[T]he twenty-one day safe harbor is not merely an empty formality," and a "court that imposes sanctions by motion without adhering to this twenty-one day safe harbor has abused its discretion." *Divane*, 200 F.3d at 1025–26. Defendants urge that they could not have filed their motion earlier because they did not have the required factual support. (Dell Reply in Supp. of Mot. for Sanctions [240], 2.) But the fact that a motion is filed as soon as practicable does not eliminate the safe harbor requirement: By the time that Defendants filed their motion, IW had already voluntarily dismissed its claims and there was no corrective action that Niro's attorneys could take. Indeed, defense counsel has admitted as much:

> We have asked the Court to shorten the time period because the purpose of the 21-day rule is to allow the adversary to withdraw the offending pleading. And here it's impossible for them to withdraw the offending pleadings because, obviously, judgment has been entered. So this is kind of an unusual

---

the court's inherent authority is "made separately" for the purposes of Rule 11. *Compare Ridder v. City of Springfield*, 109 F.3d 288, 294 (6th Cir. 1997) ("The requirement does not foreclose combining a Rule 11 request with other provisions regulating attorney behavior, such as § 1988 and § 1927") *and Prenda Law, Inc. v. Godfread*, No. 13-cv-4341, 2014 WL 381612, at *5 (N.D. Ill. Feb. 3, 2014) *with Harris v. Franklin-Williamson Human Servs., Inc.*, 97 F. Supp. 2d 892, 910 (S.D. Ill. 2000) (moving party failed to comply with "made separately" requirement because the party "filed its Rule 11 motion for sanctions in conjunction with its 28 U.S.C. § 1927 request for sanctions."). The court concludes that the Rule 11 motion is procedurally barred for failure to comply with the safe harbor provision and need not address this additional concern.

> circumstance where the Rule 21period [sic], which the rule allows the court to alter, but the presumptive 21-day period is really moot because the offensive pleadings cannot be withdrawn.

(Aug. 21, 2014 Hearing Tr., Ex. A to Niro Resp. to Dell Sanctions Mot. [234-1].)  Given HP and Palm's knowledge of the inequitable conduct allegations in the *HTC* case, defense counsel should have warned Niro at the beginning of the case that they would seek sanctions if it turned out that the allegations in the complaint were factually unsupported and filed the motion at the outset of the case.  *See Divane*, 200 F.3d at 1023 (noting that counsel first orally warned opposing party that "they would seek sanctions if [Defendant's] counterclaim was factually unsupported," and because trial court dismissed the sanctions motion as premature, filing the motion after trial sufficiently complied with safe harbor requirements).  Had Defendants followed this course of action, the court could have "taken the motion under advisement pending the resolution of the factual dispute," as the Seventh Circuit suggested in *Divane*, 200 F.3d at 1027. Defense counsel did not provide Niro with any opportunity to withdraw the offending pleading, and as this Circuit's precedents require, the court cannot impose Rule 11 sanctions where counsel did not have such an opportunity.  Rule 11 sanctions are therefore unavailable.

### B.    Timeliness of § 1927 Motion

Niro insists that if Defendants' Rule 11 motion is procedurally barred, any motion under § 1927 must also be untimely because the time limits that apply to Rule 11 motions are equally applicable to sanctions motions brought under § 1927.  (Niro Resp. to Dell Sanctions Mot. at 1– 2; Niro Resp. to HP and Palm Sanctions Mot. at 1.)  This argument, too, appears to conflate the timeliness requirement with the procedural requirement to provide a safe harbor, and significantly for this case, § 1927 contains no parallel to Rule 11's safe harbor provision.  *See Star Mark Mgmt., Inc. v. Koon Chun Hing Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 176 (2nd Cir. 2012) ("[Section] 1927. . . is not subject to the safe harbor requirement.");  *Steinert v. Winn Grp., Inc.*, 440 F.3d 1214, 1223 (10th Cir. 2006) ("[S]ection 1927 contains no counterparts to the safe harbor and separate motion requirements of Rule 11.") (internal alterations and

quotations omitted); *Smith v. Grand Bank & Trust of Florida*, 193 F. App'x 833, 836 (11th Cir. 2006) ("Section 1927, however, does not include a safe harbor period."); *Ridder v. City of Springfield*, 109 F.3d 288, 297 (6th Cir. 1997) ("Unlike Rule 11 sanctions, a motion for excess costs and attorney fees under § 1927 is not predicated upon a 'safe harbor' period.")

The two cases Niro cites do not alter the court's conclusion. *See Northlake Marketing & Supply, Inc. v. Glaverbel, S.A.*, 194 F.R.D. 633 (N.D. Ill. 2000); *XCO Int'l, Inc. v. Pacific Scientific Co.*, No. 01-cv-6851, 2003 WL 2006595 (N.D. Ill. Apr. 29, 2003). Those cases stand for the proposition that the timeliness inquiry for § 1927 mirrors the Rule 11 analysis, but they do not suggest that Rule 11's safe-harbor procedural requirement is imported into § 1927. Indeed, Judge Shadur, who authored *Northlake*, has elsewhere stated that "[s]ection 1927 does not require a warning shot across the nonmovant's bow." *Philos Technologies, Inc. v. Philos & D, Inc.*, 943 F. Supp. 2d 880, 888, n.4 (N.D. Ill. 2013). Though Niro did not have an opportunity to withdraw the offending pleading, that fact does not require the conclusion that a motion for statutory sanctions pursuant to § 1927 is untimely.

### 1. Test for timeliness under § 1927

The parties dispute what test this court should apply when evaluating whether the § 1927 motion is timely. Again relying on *Northlake* and *XCO International*, Niro asserts that any sanctions motion filed more than 90 days after final judgment is untimely. They note the conclusion in *Northlake* that "the timeliness issue . . . call[s] for identical treatment whatever the source of the claimed sanctions may be: whether Rule 11 or Section 1927 or the inherent powers of the judiciary."[11] *Northlake*, 194 F.R.D. at 636. Defendants, on the other hand, assert

---

[11] *XCO International* simply adopted the reasoning of *Northlake* in reaching the conclusion that "[t]he requirement that a motion for sanctions be filed as soon as practicable after the discovery of a Rule 11 violation should equally apply to a motion for sanctions pursuant to Section 1927." *XCO Int'l, Inc.*, No. 01-cv-6851, 2003 WL 2006595, at *5 (N.D. Ill. Apr. 29, 2003).

that the court should apply the more case-specific "as soon as practicable" analysis. As explained below, the court agrees with Defendants.

Niro has cited no Seventh Circuit case that imports the 90-day standard into § 1927 cases, and the court has found none. Though language in *Northlake* and *XCO International* appears to support Niro's position, both were decided prior to the Seventh Circuit's decision in *Sullivan v. Hunt*, 350 F.3d 664 (7th Cir. 2003), where the Court of Appeals enforced a 90-day rule as a bright-line bar to a Rule 11 motion. Before *Sullivan*, courts viewed the 90-day time frame as guidance rather than a firm rule and understood that the timeliness inquiry remained a case-by-case determination. *See, e.g., Northlake*, 194 F.R.D. at 635 (test for timeliness of any sanctions motion is whether that motion was submitted "as soon as practicable after discovery" of the sanctionable conduct) (internal quotation omitted). *Northlake* and *XCO International* did not hold that a 90-day bright-line rule applies to requests for sanctions under § 1927. Rather, those cases stand for the more general proposition that "[t]here is no more reason for permitting an unjustified delay in submission of a sanctions motion that calls one potential source of such relief into play than there is where another possible source is at issue." *Id.* at 636. The court agrees that an unjustified delay in filing a § 1927 motion would render it untimely, but the reasoning in *Northlake* and *XCO* does not persuade this court that a 90-day bright-line rule controls the determination.[12]

Finally, there are important differences between Rule 11 and § 1927 sanctions that counsel against importing the 90-day standard. First, § 1927 is a statutory remedy; adopting a 90-day standard would read in a provision absent from the text. *Dean v. United States*, 556

---

[12] Other district courts have similarly distinguished § 1927 from Rule 11 and other Federal Rules of Civil Procedure when analyzing timeliness. *See, e.g.*, *Camarillo v. Pabey*, No. 2:05-cv-455PS, 2007 WL 3102144, *7 (N.D. Ind. Oct. 22, 2007) ("Section 1927 motions are not governed by the 14 day time limit in Rule 54, but rather must be made "as soon as practicable after the discovery of a violation."); *Smith v. CB Commercial Real Estate Group*, 947 F. Supp. 1282, 1285 (S.D. Ind. 1996) ("The timeliness parameters . . . set for Rule 11 sanction motions do not apply to section 1927 motions.").

U.S. 568, 572 (2009) (Courts "ordinarily resist reading words or elements into a statute that do not appear on its face.") (internal quotations omitted); *GE Betz, Inc. v. Zee Co.*, 718 F.3d 615, 624–25 (7th Cir. 2013) ("A court has no right, in the guise of construction of an act, to either add words to or eliminate words from the language used by congress.") (internal quotations omitted). Second, § 1927 focuses on deterring the vexatious multiplication of proceedings without reference to a particular stage of the litigation, whereas Rule 11 reflects the duty of candor litigants owe to the court. Niro's interpretation would appear to prohibit § 1927 sanctions for vexatious conduct that took place in post-judgment litigation. But such vexatious conduct— unnecessarily multiplying proceedings while litigating a rule 60(b) motion more than 90 days after judgment was entered, for example—could well justify an award of sanctions. *See, e.g.*, *Enmon v. Prospect Capital Corp.*, 675 F.3d 138, 146 (2nd Cir. 2012) ("We also conclude that the District Court acted within its discretion when it sanctioned [attorneys] for filing the Rule 60(b) motion for relief from the order to compel arbitration."). In sum, the court believes that the appropriate test for evaluating the timeliness of the § 1927 motion is whether Defendants filed the motion within a reasonable amount of time.

Indeed, this case itself reveals the difficulty of applying the 90-day time limit in § 1927 cases. Niro, who has argued for a 90-day time limit, does not say precisely when the 90 days begins to run. Niro asserts that it sought voluntary dismissal of this case on September 12, 2012, triggering the 90-day clock. (Niro Resp. to Dell Sanctions Mot. at 3.) At the September 12, 2012 status hearing, Niro attorney Joseph Culig stated:

> Judge Hart issued his ruling last week. Intellect Wireless is going to be appealing that ruling. We filed a notice of appeal on Monday. So our suggestion would be to either -- one of two options. Stay this litigation resolving -- or during the resolution of the appeal, or we can dismiss this case without prejudice. And then depending on what happens at the appellate court, it either stays dismissed or then we can refile.

(Sept. 12, 2012 Hearing Trans. [147], 4:4–13.) The same day, the court entered a minute entry stating, "[c]ase is dismissed without prejudice; Plaintiff will have leave to reinstate the case

within 30 days if the Federal Circuit reverses Judge Hart's decision." (Sept. 12, 2012 Minute Entry.) A month later, on October 10, 2012, the court amended that order on Defendants' motion, stating: "Case will be dismissed with prejudice 30 days after a Federal Circuit decision affirming Judge Hart's ruling. In addition, Defendant will have leave to file a motion for an award of fees, if appropriate, 30 days after a ruling affirming Judge Hart's opinion." (Oct. 10, 2012 Minute Entry; Oct. 11, 2012 Minute Entry.)[13] Thus, though the case was voluntarily dismissed on September 12, 2012, that entry was amended a month later, and the dismissal was not final until after the Federal Circuit had ruled.

The Federal Circuit affirmed Judge Hart's decision on October 9, 2013, effectively converting the dismissal of this case to one with prejudice 30 days later. Niro itself concedes as much: "the litigation was subsequently terminated, with prejudice . . . on November 8, 2013." (Niro Resp. to Dell Sanctions Mot. at 3.) Defendants filed their motions for fees against IW on November 8, 2013 (Defs.' Mot. for Fees against IW), but did not file their motions for sanctions against IW's counsel until October 20, 2014 and November 6, 2014. If the court measures the 90-day limit starting November 8, 2013, those motions are clearly untimely. That approach, however, would have the undesirable effect of encouraging sanctions motions before discovery of information showing that they were truly warranted. The court does not believe that the law requires such an outcome. The only remaining question concerning timeliness is whether Defendants motions were filed "within a reasonable amount of time," *Sullivan*, 350 F.3d at 666 (quoting *Kaplan v. Zenner*, 956 F.2d 149, 152 (7th Cir. 1992), and the court turns to that question next.

### 2. Reasonableness analysis

As Niro sees things, Defendants unreasonably delayed in bringing their sanctions motion. According to Niro, Dell had sufficient information to bring this motion in October 2013,

---

[13]    The Federal Circuit's ruling affirming Judge Hart's decision operates to make this a with-prejudice dismissal.

immediately after the Federal Circuit affirmed Judge Hart's decision. (Niro Sur-Reply in Opp. to Sanctions [248], hereinafter "Niro Sur-Reply," 3.) But while the Federal Circuit's and Judge Hart's opinions clearly established the misconduct on Henderson's part, they did not implicate the Niro attorneys or provide the factual support necessary for a sanctions motion against them. At the time this court issued its May 30, 2014 opinion, it remained an open question whether Niro's attorneys were aware of the false declarations. (*See* Op. at 13 n.11) ("If trial counsel was indeed made aware of the false declarations, Rule 11 sanctions may also be a possibility.") Dell may have speculated that the Niro firm knew about the false declaration, but it appears Dell had not, at that point, discovered any sanctionable conduct and should not be faulted for waiting until it had a stronger basis to bring a sanctions motion.

Niro next asserts that, in the related case, HTC brought its sanctions action against the Niro firm in November 2013, and HP and Palm, represented by the same attorneys, should have brought their motion for sanctions at that point in this case, as well. (Niro Sur-Reply at 4) (citing "Case No. 1:09-cv-02945 (N.D. Ill.), Dkt. No. 232.") HTC sought sanctions based on counsel's various discovery abuses that occurred prior to trial, such as filing contradictory interrogatory answers and refusing to answer requests for admissions, abuse of the settlement process, and pursuing the baseless case through trial. Defs.' Mot. to Declare Case Exceptional and Award Fees, *Intellect Wireless v. HTC*, 09-cv-2945 [232], 5–9. HTC did mention that the suit was ill-founded and that allegations in the complaint were false, *id.* at 13, but the bulk of the motion focused on Niro's pre-trial discovery and settlement abuses, which were unique to Judge Hart's case. Defendants' motion here, unlike the motion in *HTC*, is based solely on the theory that Niro's attorneys knew that the Rule 131 Declaration was false when they filed the complaint, maintained this litigation through summary judgment despite that knowledge, and have misled the court about what Niro knew, and when. HTC's November 2013 sanctions motion does not require the conclusion that HP and Palm had in fact discovered the misconduct at issue here. It was not until June 2014—after Niro disclosed various e-mails between

Henderson and Niro attorneys—that HTC supplemented its sanctions motion in Judge Hart's case to include the allegations of misconduct that Defendants raise in this case. (*See* Defs.' Mot. to Award Attorneys' Fees against the Attorneys for IW *Intellect Wireless v. HTC*, 09-cv-2945 [300], 1) ("[I]n newly produced documents, Henderson explicitly informs Niro in writing that . . . his device could not receive caller ID.")

To emphasize: The fact that HTC sought sanctions in November 2013 on the basis of misconduct that occurred only in Judge Hart's case does not establish that HP and Palm should have, or could have, brought this sanctions motion earlier. Defendants did not move for sanctions in this case until documents produced in June 2014 showed that Niro was aware that Henderson's prototype did not operate. That correspondence was used as exhibits 2, 3, 6, and 8 to Dell's opening brief. HP and Palm similarly relied on the new disclosures in exhibits 2, 10, and 36 of their supplement to and joinder of Dell's motion. Absent that correspondence, Defendants had allegations, speculation, and tenuous inferences that IW's counsel knew about the false Rule 131 Declaration. It was not until Niro produced e-mails that Defendants could fairly be said to have "discovered" the misconduct.

It is true that Defendants in this case did not immediately file a motion for sanctions, but the court does not find the small delay unreasonable, because the discovery dispute based on the court's June 2, 2014 order was ongoing: On June 27, 2014, less than a month after the new documents were produced, Defendants filed a motion asking this court to either enforce the June 2, 2014 discovery order or impose an adverse inference that the Niro attorneys knew about the false declaration. (*See generally* Defs.' Adv. Infer. Mot.) The parties continued briefing that motion until August 1, 2014. Dell filed a motion for sanctions against Niro's attorneys on October 20, 2014, and HP and Palm joined and supplemented that motion on November 6, 2014. As counsel for HP and Palm explained, they delayed filing the motion for sanctions in the event that the court ordered additional discovery in response to the motion for an adverse inference. (*See* Oct. 23, 2014 Tr., Ex. A to Niro Resp. to HP and Palm Sanctions

Mot. [235-1], 6:20–7:18.)  Defendants might have proceeded differently, but the delay here was not unreasonable.  The court concludes that Defendants filed their motions "as soon as practicable after discovery of" sanctionable conduct, *see Kaplan* at 151, and will address the merits of those motions.

## II.     Liability under § 1927 and the court's inherent authority

### A.     Introduction

For clarity's sake, the court pauses briefly to reiterate the following undisputed facts. First, the Federal Circuit, in its opinion affirming Judge Hart's finding of inequitable conduct, concluded that "[t]here is no dispute . . . that Mr. Henderson did *not* actually reduce the claimed invention to practice."  *Intellect Wireless, Inc. v. HTC Corp.*, 732 F.3d 1339, 1342 (Fed. Cir. 2013).  Second, Niro has admitted that, as of February 2010, it was "unambiguous" that "there was no actual reduction to practice."  (Niro Adv. Infer. Resp. at 10.)  Third, the Federal Circuit found that "[i]t is undisputed that Mr. Henderson's original declaration was unmistakably false." *HTC Corp.*, 732 F.3d at 1342.  Finally, the Federal Circuit affirmed Judge Hart's finding that there was "no evidence that any of the false statements in any of the declarations were actually withdrawn, specifically called to the attention of the PTO or fully corrected."  *Id.* (citing *Intellect*, 910 F. Supp. 2d at 1072).

These undisputed facts amply supported an award of fees under § 285 against IW, as this court explained in a prior order.  (*See* Op.)  The question now, however, is different: whether IW's litigation counsel should be jointly and severally liable for Defendants' fees and costs, as well, based on their knowledge of the false declarations used to support the patents underlying the infringement claims pursued in this court.  As discussed above, Rule 11 is not the appropriate standard to judge the Niro attorneys' conduct in this case because its procedural requirements were not satisfied.  That leaves § 1927 and the court's inherent authority as the two remaining possibilities for an award of fees.  As explained below, the court concludes, after

careful consideration, that sanctions must be awarded against Niro attorneys Ray Niro, Sr., Paul

Vickrey, Paul C. Gibbons, and David Mahalek for their conduct in this litigation.

### B. Standards for an award under 28 U.S.C. § 1927 and the court's inherent authority

Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

28 U.S.C. § 1927. Even though this case arises under patent law, the court applies Seventh

Circuit law in deciding whether an award of fees is appropriate. *See Advanced Magnetic*

*Closures, Inc. v. Rome Fastener Corp.*, 607 F.3d 817, 833–34 (Fed. Cir. 2010) (applying

regional circuit court case law to review an award of attorney's fees under § 1927);

*Phonometrics, Inc. v. Westin Hotel Co.*, 350 F.3d 1242, 1246 (Fed. Cir. 2003) (same).

An award of sanctions under this section is "proper if the attorney 'has acted in an

objectively unreasonable manner by engaging in a serious and studied disregard for the orderly

process of justice[,] or where a claim is without a plausible legal or factual basis and lacking in

justification.'" *Lightspeed Media Corp. v. Smith*, 761 F.3d 699, 708 (7th Cir. 2014) (quoting

*Walter v. Fiorenzo*, 840 F.2d 427, 433 (7th Cir. 1988)) (alterations removed). "If a lawyer

pursues a path that a reasonably careful attorney would have known, after appropriate inquiry,

to be unsound, the conduct is objectively unreasonable and vexatious." *Riddle & Associates,*

*P.C. v. Kelly*, 414 F.3d 832, 835 (7th Cir. 2005) (quoting *Kapco Mfg. Co. v. C & O Enters., Inc.*,

886 F.2d 1485, 1491 (7th Cir. 1989)). Section 1927's purpose "is to deter frivolous litigation and

abusive practices by attorneys and to ensure that those who create unnecessary costs also

bear them." *Id.* Therefore, § 1927 applies to conduct that occurs "in the course of 'proceedings'

in a 'case' before the court, not misconduct that occurs before the case appears on the federal

court's docket. That is, the statute provides a discretionary sanction against attorneys who

abuse the judicial process, not those who engage in improper conduct in the runup to litigation." *Bender v. Freed*, 436 F.3d 747, 751 (7th Cir. 2006).

"Liability under § 1927 is direct, not vicarious." *FM Indus., Inc. v. Citicorp Credit Servs., Inc.*, 614 F.3d 335, 340 (7th Cir. 2010). *See also Claiborne v. Wisdom*, 414 F.3d 715, 722–24 (7th Cir. 2005) (liability is restricted to the misbehaving lawyer and may not be imputed to the lawyer's partners or law firm). However, "[w]hile it is true that section 1927 liability is direct, an order holding parties jointly and severally liable for costs after determining that each one is individually liable is a finding of direct liability." *Lightspeed Media Corp.*, 761 F.2d at 709–10 (internal citation omitted).

District courts also have the inherent power to sanction litigants and their attorneys for "bad-faith conduct or willful disobedience of a court's orders." *Grochocinski v. Mayer Brown Rowe & Maw, LLP*, 719 F.3d 785, 799 (7th Cir. 2013) (quoting *Chambers v. NASCO, Inc.*, 501 U.S. 32, 47 (1991)). "If a court may tax counsel fees against a party who has litigated in bad faith, it certainly may assess those expenses against counsel who willfully abuse judicial processes." *Roadway Express, Inc. v. Piper*, 447 U.S. 752, 766 (1980) (citations omitted). Notably, though § 1927 sanctions are inappropriate for pre-suit misconduct, that limitation

> does not leave victims of unreasonable and vexatious litigation remediless, and should not: a litigant can't be allowed to file repeated meritless suits with impunity just so long as he does not protract any one of them unreasonably. A court has inherent power . . . to punish by an award of reasonable attorneys' fees . . . misconduct by lawyers appearing before it. The limitations of section 1927 do not apply to the exercise of that power.

*Carr v. Tillery*, 591 F.3d 909, 919-20 (7th Cir. 2010) (internal citations omitted). The court is, therefore, free to sanction the pre-suit conduct in this case under its inherent authority.

### C.    Conduct of Niro attorneys

#### 1.    Filing the complaint and amended complaint

On October 20, 2010, IW filed its complaint in this case against Sharp, HP, Palm, Dell, and Garmin. (*See generally* Compl.) Niro filed an amended complaint on January 7, 2011.

The complaint and amended complaint were each signed by Joseph A. Culig[14] and contained exactly the type of vexatious allegations that § 1927 was intended to curb. In paragraph 3 of each document, IW alleged that "Mr. Henderson's prototype for a wireless picturephone device was received as part of the permanent collection of the Smithsonian Institution in the National Museum of American History," and quoted a *PC Today* article stating that "Daniel A. Henderson put together a couple of prototypes" in 1993. (*Id.* ¶ 3.) As the court explained in its May 30, 2014 opinion, these statements are "at a minimum misleading, and can fairly be read to imply that Henderson had created a working prototype of the patented invention as early as 1993," when no such creation took place. (*See* Op. at 18–19) (citing *HTC Corp.*, 732 F.3d at 1345.) "This conduct, coupled with affirmative, false declarations submitted to the PTO in order to procure patents, suggests the pattern of deceit recognized by the Federal Circuit in affirming the finding of inequitable conduct." (*Id.* at 19.)

The question the court addresses below is whether Niro's attorneys made such statements with knowledge that they were misleading, thus acting unreasonably and vexatiously in pursuing this litigation.

### a. Niro knew or reasonably should have known about the false declarations

The evidence in this case establishes that Gibbons, Mahalek, and Vickrey knew no later than November 6, 2009, that Henderson's February 9, 2007 declaration contained multiple false

---

[14] While Culig was the signatory on the two complaints and the answers to Defendants' counterclaims, the record contains scant evidence of his involvement in the litigation aside from his appearance at a status conference on September 12, 2012. (Sept. 12, 2012 Tr. [147], 4:4–13.) For example, he is not listed as receiving copies of any of the e-mails Defendants present as evidence of Niro's knowledge of the inoperability of Henderson's prototypes. While the failure to investigate the factual and legal bases underlying these pleadings may well have rendered Culig liable under Rule 11, the standard for § 1927 is higher and requires evidence of his particular involvement in the alleged malfeasance attending these sanctions. *United Stars Indus., Inc. v. Plastech Engineered Products, Inc.*, 525 F.3d 605, 610 (7th Cir. 2008) ("[Section] 1927 sets a higher standard for sanctions than do other sources such as Fed. R. Civ. P. 11(c)(3), 26(g)(3), and 37(a)(5), (b).") In the absence of further evidence demonstrating his involvement with this litigation, the court concludes that sanctions should not be levied against him.

statements.  On that day, Henderson e-mailed them with information needed to complete IW's responses to interrogatories in the *HTC* case.  In the e-mail, under the subject line "Interrogatory Information," he stated that his "device did not actually receive caller id automatically," which was a required element in each asserted patent infringement claim in this case.  (*See, e.g.*, File History of '210 Patent, IW015660) ("The invention claimed is a method of communicating information from a message originator to a message recipient having a wireless portable communication device," which includes the step of "*receiving* at the message center [] *message originator information provided automatically by the communications network as the caller ID.*") (emphasis added).  Henderson further explained in his e-mail that "[d]uring the demonstration [he] also showed them a mock-up of the intellect device that included a picture of someone sending a message, which was a picture of myself.  It did not operate but was used in conjunction to demonstrate what the invention could include."  (November 6, 2009 E-mail.)  Both admissions, that his device "did not actually receive caller id automatically from the telephone network," and that the device "did not operate," are in direct conflict with Henderson's February 9, 2007 Rule 131 declaration, which claimed

> [t]hat the *working prototype* demonstration included communicating information from a calling party connected to a communications network that provided *caller identifying information* to a called party having a portable communication device that can receive a message … *with the caller identifying information being transmitted* to the portable device through the use of a wireless network.

(Rule 131 Decl. 2–3) (emphases added.)  The next paragraph of Henderson's declaration states:

> … Appendix C is a picture of a handheld device along with a display that displayed the caller identification and associated image information *transmitted via the wireless network*.

(*Id.* at 4 (emphasis added).)  The three attorneys who received that e-mail, Gibbons, Vickrey, and Mahalek, therefore, had in their possession, as of November 2009, information necessary to conclude that Henderson's Rule 131 Declarations were false.  Filing the complaint in the face of such troubling facts is not a path that a reasonably careful attorney would have followed.

Such conduct on the part of Vickrey, Gibbons, Niro, and Mahalek in not reconciling the information Henderson provided them nearly ten months before this suit was filed was "objectively unreasonable and vexatious." *See Riddle & Associates, P.C.*, 414 F.3d at 835.

Niro's characterizations of the contents of this e-mail and its implications for pursuing litigation in this case are not convincing. First, in response to Defendants' sanctions motions, the Niro firm contends the explanation in Henderson's November 6, 2009 e-mail that the device "was used in conjunction to demonstrate [w]hat the invention could include" is sufficient to establish actual reduction to practice, even without a fully operational prototype. (*See* Niro Resp. to Dell Sanctions Mot. at 4.) Niro relies solely on *King Instrument Corp. v. Otari Corp.*, 767 F.2d 853, 861 (Fed. Cir. 1985), but that case does not support Niro's contention here. *King Instrument* states that for a patentee to establish actual reduction to practice, "there is no requirement that the invention when tested be in a commercially satisfactory stage of development." *Id.* Niro omits the preceding sentence of this quote, however, which cautions that an "invention must have been 'sufficiently tested' to demonstrate that it will work for its intended purpose." *Id.* Henderson did not meet that requirement; he admitted that the device "did not operate" (Nov. 6, 2009 E-mail), and no amount of testing would be able to change this inconvenient truth. Further, two of the Smithsonian prototypes included only wood and plastic (and there is no indication that the third was functional), which hardly reflects the type of "sufficient testing" that *King Instrument* contemplates. *See HTC Corp.*, 910 F. Supp. 2d at 1067–68, 1073. To the extent Niro believes this case provided it with a good faith legal basis for asserting actual reduction to practice in the litigation, the court disagrees. After reviewing the contents of this e-mail, Niro's attorneys knew or reasonably should have known that Henderson's statements were not consistent with an actual reduction to practice; that is, the attorneys should have known that his statements belied the Rule 131 declaration, even if Henderson himself did not.

Indeed, Niro elsewhere *in this litigation* has acknowledged that it could not rely on actual reduction to practice. Specifically, in response to Defendants' earlier motion for an adverse inference, the Niro attorneys admitted that by February 2010 they had "learned that Henderson's prototypes were not sufficiently operable to prove workability of his invention" and "prepared interrogatory answers in the HTC case" that "unequivocally" stated that there was no actual reduction to practice. (Niro Adv. Infer. Resp. at 10; *see id.* ("The interrogatory responses were clear and unambiguous – there was no actual reduction to practice[.]").) But the attorneys do not explain how they "learned" Henderson's prototypes "were not sufficiently operable to prove workability," apart from the November 6, 2009 e-mail. Notably, Gibbons forwarded that e-mail to Mahalek on February 10, 2010 to assist Mahalek in drafting interrogatory responses in the *HTC* litigation. (*See* Gibbons Feb. 10, 2010 E-mail.) Niro's attorneys apparently relied on that e-mail when they prepared the February 2010 interrogatory responses, and must have understood that Henderson's November 6, 2009 statements established that his prototypes were not operable. Niro's contention, now, that Henderson's e-mail provided it with a good faith basis to assert actual reduction to practice in this case is not credible.

Next, Niro argues that "the facts the Niro firm lawyers received from their client, Mr. Henderson [in the November 6, 2009 e-mail] suggested that he was unsure whether his prototype did or did not constitute an actual reduction to practice under the law," and that Niro was entitled to rely on Henderson's recitation of events in determining whether it was appropriate to initiate and continue the suit. (Niro Resp. to HP and Palm Sanctions Mot. at 6; Niro Resp. to Dell Sanctions Mot. at 9 (citing *Philos Techs.*, 943 F. Supp. 2d at 890).) Niro also points to Henderson's February 2011 e-mail response to Mahalek concerning IW's Second Supplemental Interrogatory Response in the *HTC* case. In that message, Henderson commented, "I guess we are then taking the position that there was no actual reduction to practice? I am still not clear on whether or not what I built constitutes actual reduction or not in terms of the legal definition." (*See* Henderson Feb. 24, 2011 E-mail.) Henderson remained

confused at that time, Niro maintains, apparently asserting that means it was appropriate for Niro to pursue this litigation.

But Niro's focus on whether Henderson himself believed there was an actual reduction to practice misses the point. The issue in this case is not what level of legal knowledge Henderson possessed about the intricacies of patent law; rather, the issue is whether Niro attorneys knew that Henderson's Rule 131 Declaration contained false statements about having a "working prototype," (Rule 131 Decl. ¶ 9), and whether the Niro firm's attorneys filed and continued this case, despite knowing the patent had been procured through fraud on the PTO. *Philos Technologies*, in any event, is easily distinguished: There, attorneys relied on their client's story "in the first instance," and when they questioned that story, they were "provided with claimed evidentiary support," which was produced "with the aid of lawyers elsewhere." 943 F. Supp. 2d 880, 890 (N.D. Ill. 2013). Here, Henderson did not provide Niro's attorneys with any evidentiary support, and the evidence that was available to Niro was inconsistent with a finding that the prototype was functional. Moreover, after HTC's inequitable conduct allegations, Niro had an obvious reason to question the client rather than relying blithely on his recollection of events (or confusion about them). Finally, whatever Henderson's confusion was about the legal requirements for actual reduction to practice, it did not absolve Niro's attorneys, trained in patent law, to see that the Rule 131 Declarations were deceitful and would completely undermine IW's ability to litigate patent infringement claims.

Even assuming for the sake of argument that Niro's attorneys did not recognize that Henderson's Rule 131 Declarations were false in 2009, HTC's counsel alerted Niro to the fraud on September 23, 2010, a month before the complaint was filed in this case. Specifically, HTC attorneys e-mailed Ray Niro, Mahalek, Gibbons, and Vickrey, attaching a letter addressed to Mahalek that explained, in exacting detail, how "Mr. Henderson and the prosecuting attorney, Mr. Tendler, knowingly submit[ed] false 131 declarations to the patent office in order to obtain an allowance of the patents-in-suit." (Sept. 23, 210 Letter at 1.) HTC later filed its amended

answer, in November of 2010, including the inequitable conduct allegations, and asserting: "The [Rule 131] declarations allege that Henderson had built (i.e., 'actually reduced to practice') the claimed inventions in the '186 and '416 patents, when in fact, the inventions were never built." *See* HTC's First Am. Answer *Intellect Wireless v. HTC*, No. 09-cv-2945 [97], ¶ 32. Even these explicit allegations did not prompt Niro attorneys to rethink the appropriateness of maintaining their infringement suit against Defendants here. Instead, Niro, acting through Mahalek, doubled down, explaining to Henderson that in response to HTC's allegations, "[w]e'll counter with the argument that the majority of the declaration refers to a constructive reduction to practice, so the examiner could not have been misled." (Nov. 5, 2010 E-mail.) Niro then filed an amended complaint on January 7, 2011, repeating the misleading allegations about the prototype in the Smithsonian and elaborating on its allegations of infringement. The amended complaint unnecessarily multiplied these proceedings by requiring each Defendant to submit an additional answer. (*See* Dell Ans. to Am. Compl. [94]; Sharp Ans. to Am. Compl. [95]; HP Ans. to Am. Compl. [96]).)

While § 1927 sanctions are inappropriate for conduct in the run-up to litigation, *Bender*, 436 F.3d at 751, under § 1927, lawyers have a continuing duty to withdraw claims that are no longer viable. *See Butler v. F.D.I.C.*, No. 11-cv-06692, 2014 WL 843605, at *6 (N.D. Ill. Feb. 28, 2014) ("[T]he Seventh Circuit has interpreted 28 U.S.C. § 1927 as the appropriate source of authority 'to impose a continuing duty upon attorneys to dismiss claims that are no longer viable.'"). Niro's attorneys failed to carry out that duty in this case, instead filing an amended complaint that repeated the misleading Smithsonian statements and continued to pursue infringement claims on a patent Niro's attorneys either knew or should have known was unenforceable. This conclusion rests in part on consideration of communications that occurred prior to filing the complaint in this case; that conduct is not in itself a basis for § 1927 sanctions, but support sanctions awarded under the court's inherent authority. *See Carr*, 591 F.3d at 919–20. And the pre-filing timeline provides factual support for the court's conclusion that when Niro

filed the amended complaint, on January 7, 2011, its continued pursuit of this case was vexatious and an unnecessary multiplication of the proceedings under § 1927.

> **b.    Constructive reduction to practice does not provide a good faith basis for the suit**

Niro responds that, even if the actual reduction to practice claims were untenable, its pursuit of the case was not unreasonable and vexatious because it could rely on the independent ground of constructive reduction to practice. Niro continues, "Neither Dell nor anyone else has ever argued that Mr. Henderson's constructive reduction to practice (*i.e.*, the filing of his patent application) was not early enough to prove his invention predated the Albert prior art." (*Id.*) This argument ignores the central problem with this case: the patent was invalid based on Henderson's fraud on the PTO, and Niro ignored all signs of that fraud and chose to enforce the patent regardless. Constructive reduction to practice is indeed an alternative basis for showing priority of a patent (*see* Niro Resp. to Dell Sanctions Mot. at 7–8 (citing *Robert L. Harmon*, Patents and the Federal Circuit § 18.2(c) 1235 (10th ed. 2011)), but inequitable conduct will invalidate a patent regardless of whether the applicant relied on constructive or actual reduction. *Cf. Star Scientific, Inc. v. R.J. Reynolds Tobacco Co.*, 537 F.3d 1357, 1365–66 (Fed. Cir. 2008). Moreover, inequitable conduct affects not only a specific claim, but the entire patent, and may even "spread from a single patent to render unenforceable other related patents and applications in the same technology family." *Therasense, Inc. v. Becton, Dickinson & Co.*, 649 F.3d 1276, 1288–89 (Fed. Cir. 2011) (citing *Consol. Aluminum Corp. v. Foseco Int'l Ltd.*, 910 F.2d 804, 808–12 (Fed. Cir. 1990)). Niro's argument that it could rely on constructive reduction to practice to salvage the patents and continue its enforcement litigation must fail.

Niro should have recognized that IW's patents were unenforceable due to Henderson's inequitable conduct. The inequitable conduct defense is satisfied if "the applicant misrepresented or omitted material information with the specific intent to deceive the PTO." *Therasense, Inc.,* 649 F.3d at 1287; *see also Star Scientific, Inc.*, 537 F.3d at 1365. The facts in

this case strongly suggested that Henderson's conduct met both prongs. As for intent, it is well-established that "[s]ubmission of an affidavit containing fabricated examples of actual reduction to practice in order to overcome a prior art reference raises a strong inference of intent to deceive." *HTC Corp.,* 732 F.3d at 1345. The Federal Circuit in this case concluded that Henderson's intent to deceive could be inferred from his submission of the two declarations alone. *Id.* After all, the first Rule 131 Declaration, which included the false statement that Henderson had demonstrated a "working prototype" was followed by a replacement declaration that, "rather than expressly admitting the earlier falsity, dances around the truth," by continuing to reference a prototype, a product brochure, and the device's commercialization, even as it simultaneously hedged by purporting to rely on a constructive, rather than actual, reduction to practice. *Id.* While Niro argues now that Henderson had no such intent to deceive, and was instead "confused" by what actual reduction to practice means (Henderson Feb. 24, 2011 E-mail), Niro's attorneys had their own duty to assess the merits of the PTO declarations.

The case for establishing the false declaration's materiality prong was even stronger. Typically a defendant must show that the patent would not have been granted, but for the omitted information. *Therasense,* 649 F.3d at 1291. But, "[w]hen a patentee has engaged in affirmative acts of egregious misconduct, *such as the filing of an unmistakably false affidavit*, the misconduct is material," even if there is another basis for granting the patent. *Id.* at 1292 (emphasis added). That is, the availability of constructive reduction to practice does not excuse the filing of an affirmatively false affidavit. This principle was well-established before the Niro attorneys took on this case. *See Refac Int'l, Ltd. v. Lotus Dev. Corp.,* 81 F.3d 1576, 1583 (Fed. Cir. 1996) (finding the intentional omission of declarant's employment with inventor's company rendered the affidavit false and that "[a]ffidavits are inherently material"); *Rohm & Haas Co. v. Crystal Chem. Co.,* 722 F.2d 1556, 1571 (Fed. Cir. 1983) ("[T]here is no room to argue that submission of false affidavits is not material[.]"). Moreover, in *Therasense*, the Federal Circuit "tighten[ed] the standards for finding both intent and materiality in order to redirect a doctrine

47

that has been overused." 649 F.3d at 1290. When Niro filed this action in 2010, the standards for showing inequitable conduct were, thus, even more lax than they are now—with many courts applying the "reasonable examiner" standard for materiality. *Id.* at 1288. Simply put, any reasonable review of the patent prosecution history would have identified Henderson's contradictory and deceptive statements to the PTO and forcefully counseled against patent enforcement litigation.

### c. Presumption of validity does not provide a good faith basis for the suit

Niro argues that because patents are presumed valid and enforceable under 35 U.S.C. § 282, an attorney has a right to rely upon that presumption in pursuing an infringement claim. That is, Niro contends, just because "the patents asserted by [IW] were later found unenforceable does not retroactively create a contrary presumption that his attorneys should have known they were unenforceable before such a finding." (Niro Resp. to Dell Sanctions Mot. at 10.) True enough, but the presumption of validity is itself overcome when a patent is obtained through fraud. *Cf. Therasense,* 649 F.3d at 1291–93 (presumption of validity overcome by successful inequitable conduct defense). Niro had no objectively reasonable basis for bringing or maintaining this litigation.

### 2. Niro's answer to the inequitable conduct counterclaim

Niro continued to overstate the functionality of Henderson's prototypes in its pleadings in this case. As the court explained above, by February 2010, if not sooner, Niro admits it knew that Henderson's prototypes did not operate. That admission makes Niro's answer to HP's counterclaims in this case, filed on July 1, 2011 by Culig a year and half *later*, all the more troubling:

> 50. Further, Henderson and Attorney Tendler submitted seven other Rule 131 declarations in support of related patent applications, in which Henderson swore that the inventions underlying those applications had been actually reduced to practice. Those inventions were not actually reduced to practice either.
>
> **Response**: Denied.

48

. . .

66. The "prototype" is not an actual reduction to practice of the patents-in-suit.

**Response**: Admitted that the functional prototype Henderson demonstrated in or around July 1993 to Dr. Hashimoto was not an actual reduction to practice of the inventions of the patents-in-suit; otherwise denied, because Henderson believed this functional prototype to be an actual reduction to practice of inventions of U.S. Patent No. 6,278,862, as the prototype received a message from a message originator, had a database of communicants that included information such as name, telephone number, and other information, and included a display that could show a name and telephone number upon receipt of a wireless signal.

. . .

100. The claimed invention of the '846 application was never actually reduced to practice.

**Response**: Admitted that neither Henderson nor Intellect Wireless actually reduced to practice the claimed inventions of the '846 application; otherwise denied because Henderson actually reduced to practice inventions of U.S. Patent No. 6,278,862, as Henderson developed a functional prototype that received a message from a message originator, had a database of communicants that included information such as name, telephone number, and other information, and included a display that could show a name and telephone number upon receipt of a wireless signal, which was demonstrated to Kazuo Hashimoto in July of 1993.

101. The claimed invention was not demonstrated at a meeting with Kazuo Hashimoto in July of 1993.

**Response**: Denied. Henderson demonstrated a functional prototype to Kazuo Hashimoto in July of 1993. Further denied to the extent that HP and Palm is relying upon events from the prosecution of the '210 patent because the '210 patent has not been asserted against HP and/or Palm.

. . .

106. Henderson never actually reduced the invention of the '846 application to practice.

**Response**: Admitted that Henderson did not actually reduce to practice the claimed inventions of the '846 application; otherwise denied because Henderson actually reduced to practice inventions of U.S. Patent No. 6,278,862, as Henderson developed a functional prototype that received a message from a message originator, had a database of communicants that included information such as name, telephone number, and other information, and included a display that could show a name and telephone number upon receipt of a wireless signal. Further denied that the prosecution of the '210 patent is relevant because the '210 patent has not been asserted against HP and/or Palm in this case.

. . .

119. The '824 Declaration contained false and misleading statements.[15]

**Response**: Denied.

133. The '677 Declaration contained false and misleading statements.[16]

**Response**: Denied.

273. Henderson did not demonstrate a "working prototype" of the invention underlying the '846 application to Kazuo Hashimoto in July 1993.

**Response**: Denied, Henderson did demonstrate a working prototype to Kazuo Hashimoto in July 1993. Further denied that the prosecution of the '210 patent is relevant since the '210 patent has not been asserted against HP and/or Palm in this case.

(IW Ans. to HP and Palm Counterclaim [112].) IW made similar statements in response to Sharp's counterclaim (*see also* IW Ans. to Sharp Counterclaim [110], ¶¶ 80–85, 87) (describing "functioning" or "functional" prototypes), and continued to repeat the false assertions that Henderson had developed a working prototype at the Hashimoto demonstration:

185. Upon information and belief, the following statement from the August 16, 2006[17] Declaration is unmistakably false:

> the claimed invention was actually reduced to practice and was demonstrated at a meeting with Kazuo Hashimoto of Hashimoto Corporation in July of 1993 pursuant to a licensing agreement in which the undersigned was required to demonstrate a working prototype (Appendix W), and that block diagrams for this prototype are presented in Appendices E, F, G and X hereto.

**Response**: Denied.

---

[15] The '824 Declaration refers to the '186 patent, which issued from United States Patent Application Number 10/033,824. (*See* U.S. Patent No. 7,266,186, Ex. 29 to HP Mot. for Sanctions [232-30], 1.)

[16] The '677 Declaration refers to the '416 patent, which issued from United States Patent Number 11/045,677 (*See* U.S. Patent No. 7,310,416, Ex. 30 to HP Mot. for Sanctions [232-31], 1.)

[17] As Judge Hart explained, between August and December of 2006, Daniel Henderson submitted to the PTO three Rule 131 Declarations to assert the priority of patents in his portfolio over other similar patents cited by the examiner. *HTC Corp.,* 910 F. Supp. 2d at 1061.

187. Upon information and belief, there was no working prototype demonstration because there was no working prototype before or during July of 1993.

**Response**: Denied. Henderson developed a functioning prototype that was demonstrated to Kazuo Hashimoto in July 1993 and that received a message from a message originator, had a database of communicants that included information such as name, telephone number, and other information, and included a display that could show a name and telephone number upon receipt of a wireless signal.

188. Upon information and belief, the following statement from the August 16, 2006 Declaration is unmistakably false:

> That the working prototype demonstration included communicating information from a message sender connected to a communications network that provided caller identifying information to a message recipient having a portable communication device that can receive a message, with the caller identifying information being transmitted to the portable device through the use of a wireless network.

**Response**: Denied.

(IW Ans. to Sharp Counterclaim [110] ¶¶ 185, 187–88; *see also id.* at ¶¶ 203, 223, 334, 335, 336.) These responses, in particular the reference to a "working prototype" in July 1993 and the spurious attempts to distinguish between "functional prototype" and an "actual reduction to practice," stretches the bounds of zealous advocacy beyond what it can bear. Henderson made at least two, distinct, false statements to the PTO: (1) that there was an actual reduction to practice, and (2) that the prototype he demonstrated in 1993 was a "working prototype." *See HTC Corp.*, 732 F.3d at 1345 ("The original declaration contains multiple unmistakably false statements.") Niro did not repeat the false statements regarding actual reduction to practice, but that does not excuse the repeated misleading statements that Henderson had a "working" or "functional" prototype. As for Paragraph 100 ("Henderson actually reduced to practice inventions of U.S. Patent No. 6,278,862, as Henderson developed a functional prototype. . . ."), Niro knew this story was not true because the only independent claim on the '862 patent requires "automatically passing said caller-identification information" and "receiving caller identification information . . . at said portable communication device"—features that Henderson's device did not have, as he told Niro in the November 6 e-mail. (*See* Nov. 6, 2009

E-mail) ("This device did not actually receive caller id . . . ")  Finally, Niro's attempts to distance this case from the '210 case is again deceptive:  the two patents-in-suit here asserted claims "with an explicit dependence on the allowability of the '210 patent."  *HTC Corp.*, 910 F. Supp. 2d at 1065.

### 3. Niro's misconduct after the § 285 fee award

The court's review of the record reveals that Niro's attorneys not only repeatedly misrepresented the functionality of Henderson's prototypes, but have continued to make misleading statements about what Niro's attorneys actually knew and when they knew it.  First, in a motion for a protective order, Vickrey declares that the Niro firm "had no discussions about the Rule 131 Declaration with Messrs. Henderson and Tendler before filing suit."  (Pl.'s Mot. for Protective Order at 1–2.)  This claim appears to be in tension with the November 6, 2009 e-mail, wherein Henderson explained that his wife had signed and witnessed "conception drawings in January and February of 1993 that were referenced in [Henderson's] *Rule 131 Declaration*," and that a company in Canada had asked him about "pricing and delivery information," which would also be in his Rule 131 Declaration.  (Nov. 6, 2009 E-Mail) (emphasis added.)  Niro attempts to wiggle out of this contradiction by arguing that Vickrey meant that no one at the Niro firm had discussions about the particular February 9, 2007 false declaration, but that they did review *other* Rule 131 Declarations.  (Niro Resp. to HP and Palm Sanctions Mot. at 9–10.)  Niro's firm continued to file declarations with this court as recently as February 13, 2015, repeating Vickrey's assertion that "nobody at the Niro firm knew about the February 9, 2007 declaration and/or its inaccuracies prior to filing suit."  (Niro Supp. Mem. in Opp. to Mot. for Adv. Inf. [263], 3.)

These statements might theoretically be reconciled, but the court notes that Vickrey and Ray Niro have elsewhere sworn that Niro conducted "extensive" investigation into the file history "by the time this suit was brought in October 2010," and that they "studied" the patent prosecution.  (Ray Niro Decl. ¶ 4; Second Vickrey Decl. ¶ 10.)  Any "study" of the publicly-

available prosecution history of the patent would have put the Niro firm on notice that Henderson made a false declaration, never corrected it, and instead chose to file a confusing supplemental amendment to muddle up the truth. As Judge Hart explained, "[t]here is no evidence that any of the false statements in any of the declarations were actually withdrawn, specifically called to the attention of the PTO or fully corrected." *HTC Corp.*, 910 F. Supp. 2d at 1072. The Federal Circuit agreed, concluding that "[a]t best, the revised declaration obfuscated the truth." *HTC Corp.*, 732 F.3d at 1343. If Niro did in fact review the patent prosecution history, Vickrey's statement that no one saw the February 9, 2007 declaration is not credible. If the Niro firm did not actually review the patent prosecution history, then Vickrey's and Niro's statements that an "extensive" investigation took place are not credible. Regardless of the truth of the matters asserted, Vickrey and Niro's confusing declarations about what the firm did or did not review supports a finding that Niro's attorneys have "unreasonably and vexatiously" multiplied the proceedings in this case through dilatory conduct. 28 U.S.C. § 1927.

Next, as the court has noted above, Niro, through Vickrey, represented that "Mahalek's November 5, 2010 email [was] the very first time the Niro firm saw HTC's inequitable conduct claim." (Niro Adv. Infer. Resp. at 6.) That statement is hard to square with the existence of HTC's September 2010 letter, copies of which were sent to Vickrey, Mahalek, Niro, and Gibbons, in which HTC explained its basis for pursuing inequitable conduct counterclaims in Judge Hart's case. Niro's motivation for claiming that it did not see the allegations until November 2010 seems simple enough: the complaint in this case was filed in October 2010, and relying on the actual date of filing for the counterclaims (November 2010), as opposed to the warning letter (September 2010) would potentially shield Niro from Rule 11 sanctions, which require an adequate pre-suit investigation. (*See* Sept. 23, 2010 Letter); *Beverly Gravel, Inc. v. DiDomenico*, 908 F.2d 223, 225 (7th Cir. 1990) ("Rule 11 imposes an affirmative duty of reasonable investigation on an attorney signing any paper." (quoting *Fred A. Smith Lumber Co. v. Edidin*, 845 F.2d 750, 751 (7th Cir. 1988))). The arguments now being made by Niro might

thread the needle to avoid Rule 11 sanctions, but the conduct is still sanctionable under § 1927 and the court's inherent authority, which require good faith in counsels' representations to the court.

Finally, as the court noted above, Niro's attorneys admitted they knew, unequivocally, by February 2010 that there was no actual reduction to practice, but those same attorneys argue to this court, now, that Henderson's recitation of facts reasonably led the firm to believe there may have been an actual reduction. The inconsistent assertions used to cabin Niro's exposure has made it difficult for the court to measure and weigh the evidence. No single statement or misrepresentation by Niro attorneys would warrant sanctions, but the court is left with the unavoidable impression that those attorneys have engaged in a campaign to paper over the implications of Henderson's admissions to the firm in his November 6, 2009 e-mail.

### D. Sanctions are appropriate

Notwithstanding these specific examples of misconduct, Niro argues that it did not act unreasonably and vexatiously in maintaining this lawsuit because the firm, through its attorneys, agreed to stay the case when HTC made its inequitable conduct allegations, agreed to dismiss the case during the pending appeal of the *HTC* case, and agreed to dismiss it with prejudice once the appeal was resolved in HTC's favor. (Niro Resp. to Dell Sanctions Mot. at 11–12.) The court acknowledges that those decisions kept the expense and burden of this litigation from mounting still further, but they unfortunately do not eliminate liability for the misconduct altogether.

Finally, Niro argues that Defendants cannot identify any specific acts of its accused lawyers that justify sanctions under § 1927. They note the Seventh Circuit's admonition that

> Section 1927 does not require every lawyer who files an appearance to review and vet every paper filed by every other lawyer. Neither the text of § 1927, nor any decision of which we are aware, imposes on any lawyer a duty to supervise or correct another lawyer's work. . . . personal responsibility remains essential to an award of sanctions under § 1927.

*FM Indus., Inc.*, 614 F.3d at 340–41. The court agrees that it must make personal liability findings, and is prepared to do so with respect to Attorneys Ray Niro, Vickrey, Gibbons, and Mahalek, in light of the e-mails mentioned exhaustively above. Those e-mails establish that all four attorneys were aware no later than February 2010 that Henderson's prototype was inoperable, that Henderson's declaration to the PTO stated that the prototype was operable, and that consequently his patents were likely invalid. Moreover, Vickrey and Ray Niro have submitted declarations in the most recent rounds of briefing that contain misleading statements. Their lack of candor unnecessarily prolonged the litigation as Defendants had to respond to those inaccurate statements, and required the court to expend unnecessary time and energy parsing the record. Though Mr. Niro alleges he spent only seven hours in this case, (Oct. 23, 2014 Tr., Ex. A to Niro Resp. to HP and Palm Sanctions Mot. [235-1], 9:20-21), the evidence leads the court to conclude that Mr. Niro had the same knowledge as Vickrey, Gibbons, and Mahalek. There is no basis in the record for treating him differently.

## CONCLUSION

For the reasons explained above, the court grants Defendants' motions [227] [231] [233] for sanctions in the form of their attorneys' fees generated in this litigation. The court denies the motion for an adverse inference [181] as moot. The pending motions for an award of fees against Intellect Wireless [194, 195, 198] are terminated without prejudice so that counsel can renew motions seeking fees against IW and counsel pursuant to this ruling. Niro's motion to strike HP's sur-response [252] is denied. This case is referred to the calendar of Magistrate Judge Jeffrey Cole for settlement.

ENTER:

Date: April 3, 2015

_____
REBECCA R. PALLMEYER
United States District Judge